RAYMOND CHAMPAGNE vs. COMMISSIONER OF CORRECTION[1]
& others.[2]

Norfolk. March 6, 1985. — July 11, 1985.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Imprisonment,* Prison regulations. *Constitutional Law,* Imprisonment, Freedom of speech and press. *Due Process of Law,* Prison regulation. *Civil Rights,* Attorney's fees.

A prison policy requiring that any inmate wishing to receive items of property from outside the institution must submit a permission slip and obtain the approval of a designated staff member did not, as applied to books and other publications, infringe a prisoner's rights under the First Amendment to the United States Constitution. [386-389]

In an action by a prisoner who claimed that correctional personnel had impermissibly opened correspondence addressed to him by his attorney, the plaintiff failed to allege that any of the defendants was responsible for the challenged conduct. [389-390]

A prison regulation which allowed the superintendent of the institution or his designee to disapprove a prisoner's receipt of correspondence which contains "[i]nformation and materials which would create a significant threat to the security or order of the institution or to the physical safety of an individual," although furthering a substantial governmental interest, was so broad as to provide insufficient guidance to staff members charged with its enforcement and thus was constitutionally impermissible. [390-393]

A prison regulation which allowed the superintendent of the institution or his designee to disapprove a prisoner's receipt of correspondence containing "[p]lans for activities in violation of departmental or institutional regulations, order[s] o[r] policies," furthered a substantial governmental interest and was not unconstitutionally vague. [393]

Prison regulations allowing an inmate to appeal a staff member's decision to confiscate his incoming correspondence were adequate to safeguard his due process rights. [393-395]

---

[1] Michael Fair.

[2] Joseph Ponte, superintendent of the Massachusetts Correctional Institution at Cedar Junction (M.C.I., Cedar Junction); Jesse Motta and Robert Furtado, correction officers at M.C.I., Cedar Junction.

This court noted that the value of the services of law students practicing under leave of court pursuant to S.J.C. Rule 3:04, as appearing in 382 Mass. 760 (1981), may be recoverable by an aggrieved-person prevailing in an action under Federal or State civil rights statutes, provided the students were supervised by an attorney. [395]

CIVIL ACTION commenced in the Superior Court Department on July 14, 1982.

The case was heard by *Roger J. Donahue, J.,* on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Arthur B. Leavens* for the plaintiff.

*John A. Amabile,* Assistant Attorney General, for Commissioner of Correction & others.

HENNESSEY, C.J. The plaintiff, an inmate at the Massachusetts Correctional Institution at Cedar Junction, appeals from an order of the Superior Court granting summary judgment to the defendant prison officials. He alleges that the defendants censored and confiscated his incoming publications, thereby violating his speech and due process rights under both the Federal and Massachusetts Constitutions. He also contends that he was denied his constitutional rights of access to the courts and assistance of counsel by the defendants' mishandling of his legal correspondence. The plaintiff's complaint seeks declaratory and injunctive relief, money damages, and attorneys' fees. We conclude that the defendants' initial failure to deliver incoming books to the plaintiff was in accordance with permissible prison policy and did not violate the plaintiff's constitutional rights. The defendants were entitled to summary judgment on this count, as well as on the plaintiff's claim concerning his legal correspondence. However, we agree with the plaintiff that one of the prison regulations governing the censorship of incoming mail is unconstitutionally vague and overbroad. We therefore allow his motion for summary judgment on this issue, and we direct the entry of an appropriate declaration of rights.

We cite the following undisputed facts, as we have culled them from affidavits, answers to interrogatories, and answers

to demands for admission of facts, all as included in a somewhat voluminous and not entirely orderly record. On June 17, 1982, a bookseller mailed to the plaintiff two books. One was a hardcover entitled "The Struggle to be Human: Crime, Criminology and Anarchism"; the other was a paperback entitled, "The Guinea Pigs." On or about July 7, 1982, the plaintiff received notice from the defendant Furtado, a mail officer at M.C.I., Cedar Junction, that the books would not be delivered to him and that they could either be picked up by his designee or returned to the sender. The reasons given to the plaintiff for withholding the books were: (1) that he had failed to submit the required property permission slips, and (2) that hardcover books were not permitted in the Departmental Segregation Unit where the plaintiff was at the time incarcerated. The parties disagree over whether the plaintiff was afforded a right to appeal Furtado's action. On August 3, 1982, the plaintiff's attorneys claimed the withheld books.

On October 14, 1982, the plaintiff's attorneys mailed to him a package of legal documents in an envelope stamped as attorney-client correspondence. This package was delivered to the plaintiff on November 19, 1982, having already been opened and inspected. The plaintiff alleges that he was not present during the inspection as is required by prison mail regulations.

On November 15, 1982, the plaintiff was mailed a paperback book entitled "The Hate Factory," which concerned the 1981 riots at the New Mexico State penitentiary. On December 1, 1982, the plaintiff was notified by the defendant Furtado that this book had been classified as contraband and would not be delivered. After the plaintiff, through counsel, objected to the classification, Furtado's decision was overturned by Deputy Superintendent Olive Langlois. However, Furtado refused to deliver "The Hate Factory" until the plaintiff submitted the requisite property permission slip.

On January 6, 1983, the plaintiff filed a supplemented and substituted complaint alleging that: (1) the defendants' interference with his mail and failure to afford him minimal procedural safeguards violated his rights under the First and Fourteenth Amendments to the Federal Constitution and under the Massa-

395 Mass. 382 385

chusetts Declaration of Rights; (2) two of the prison mail regulations authorizing censorship of incoming mail are unconstitutionally vague and overbroad; (3) by opening and inspecting his legal correspondence outside of his presence, the defendants denied him his constitutional rights of access to the courts and of effective assistance of counsel; and (4) the defendants' confiscation of his books for an unreasonable period of time amounted to an intentional conversion of his property.[3] Pursuant to 42 U.S.C. § 1983 (1982) and G. L. c. 231A and c. 12, § 11I (1984 ed.), the plaintiff sought declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees.

On February 4, 1983, the plaintiff successfully moved for a preliminary injunction ordering the defendants to deliver to him the three books described above, and any other books and publications mailed by a publisher or bookseller, upon his presentation of a property permission slip. In June, 1983, the plaintiff filed a motion for civil contempt alleging that the defendants had violated the terms of the injunction by withholding publications. As a result of this motion, and after a hearing in the Superior Court, the books were delivered to the plaintiff.

The defendants then filed their motion for summary judgment on July 1, 1983, and supporting memorandum on August 19, 1983. They argued that: (1) the defendants Motta, Fair, and Ponte were not personally involved in the actions complained of and therefore cannot be held liable for damages;[4] (2) the defendant Furtado is not liable because he acted in good faith reliance upon constitutional policies and regulations; and (3) the regulations challenged by the plaintiff do not violate his constitutional rights. The plaintiff then filed memoranda in opposition to the defendants' motion and moved for summary judgment with regard to the constitutionality of the challenged

---

[3] In oral argument before this court, the plaintiff waived his conversion claim. We therefore do not consider this issue on appeal.

[4] The United States Supreme Court has held that the doctrine of respondeat superior is inapplicable to actions for damages under 42 U.S.C. § 1983 (1982). *Polk County* v. *Dodson,* 454 U.S. 312, 325 (1981). *Monell* v. *Department of Social Servs. of the City of N.Y.,* 436 U.S. 658, 694 (1978).

prison regulations. On September 22, 1983, the defendants' motion for summary judgment was allowed. We, of course, may consider any ground supporting the defendants' motion. See *Gallant* v. *Worcester,* 383 Mass. 707, 709 (1981).

1. *Permission Slip Policy.*

The defendants contend that the books mailed to the plaintiff were withheld in accordance with a content-neutral prison policy requiring inmates to submit property permission slips for all incoming personal property. Therefore, they argue that they were entitled to summary judgment on the plaintiff's claims for damages and injunctive relief. We agree.

It is undisputed that the plaintiff did not initially submit the required permission slips for the three books named in his complaint, that he was notified that the books would not be delivered without such slips, and that upon presenting the slips, pursuant to the terms of the preliminary injunction, the plaintiff received the books. We therefore must consider whether the permission slip policy is an unconstitutional infringement of the plaintiff's First Amendment rights.

At the outset, the defendants contend that, since the plaintiff ultimately received his books, his claim has been mooted. However, because this case concerns a prisoner's First Amendment rights, we think that, even though the case is factually moot, the underlying constitutional questions are "of public importance, capable of repetition, yet evading review." *Commissioner of Correction* v. *Myers,* 379 Mass. 255, 261 (1979), quoting *Superintendent of Worcester State Hosp.* v. *Hagberg,* 374 Mass. 271, 274 (1978). Further, we note that, given the facts presented here, the plaintiff's Federal and State constitutional claims are subject to the same standard of review. See *Commonwealth* v. *Franklin Fruit Co.,* 388 Mass. 228, 235 (1983); *Zayre Corp.* v. *Attorney Gen.,* 372 Mass. 423, 433 n.22 (1977). The United States Supreme Court has held that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell* v. *Procunier,* 417 U.S. 817, 822 (1974). Specifically, the Court has stated that "[t]he interest of prisoners and their corres-

pondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment. As such, it is protected from arbitrary governmental invasion." *Procunier* v. *Martinez,* 416 U.S. 396, 418 (1974). Following these guidelines, several courts have recognized the First Amendment rights of prisoners to receive publications mailed from outside. *Hopkins* v. *Collins,* 411 F. Supp. 831, 833 (D. Md. 1976), modified, 548 F.2d 503 (4th Cir. 1977).

However, "simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations. . . . The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights. . . . Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Bell* v. *Wolfish,* 441 U.S. 520, 545-547 (1979). See *Jackson* v. *Hogan,* 388 Mass. 376, 381 (1983). *Commissioner of Correction* v. *Myers,* 379 Mass. 255, 264 (1979). Prison administrators are therefore "accorded wide-ranging deference" in the "adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell, supra* at 547. See *Myers, supra* at 264; *Jones* v. *North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 126 (1977).

The defendants contend that the prison's permission slip policy is a limited content-neutral restriction of First Amendment rights justified by the need to regulate the flow of property and maintain order within M.C.I., Cedar Junction. In order to obtain any property from outside the prison, an inmate is required to submit a permission slip, which must be signed by his unit manager and forwarded to the person who will be mailing the goods. Books and publications are treated in the same manner as all types of incoming property; slips are required

without regard to the book's content. The defendants claim the policy serves "to protect and document property, to prevent fraudulent lost property claims, and to implement valid quantity and quality restrictions on property." In light of the policy's insignificant infringement of First Amendment rights, the "substitution of judicial judgment for that of the expert prison administrators on matters such as this is inappropriate." *Bell, supra* at 554.

Federal courts have upheld similar content-neutral regulations which have been attacked on First Amendment and due process grounds. In *Bell, supra* at 551, the Supreme Court approved as a valid security measure a regulation prohibiting the receipt by prisoners of hardcover books unless mailed directly from publishers, book clubs, or bookstores. In *Gray* v. *Creamer,* 376 F. Supp. 675, 678 (W.D. Pa. 1974), a judge held that there had been no unconstitutional censorship of publications where prisoners "had not complied with ordering procedures whereby a request is first submitted to the Institution and then forwarded to the publisher." Similarly in *Mahler* v. *Slattery,* 489 F. Supp. 798 (E.D. Va. 1980), a judge ruled that prison authorities had not unlawfully interfered with an inmate's mail by returning letters to their senders where the inmate had refused to sign a standard form giving them authority to open and read nonlegal incoming correspondence. "The plaintiff will not be heard to complain of letters returned to the sender when the instrument for his relief is in his own hands." *Id.* at 800.

In these cases, where the approved prison procedure was applied exclusively to incoming correspondence and publications, the restriction of First Amendment rights was considerably greater than the purely incidental effects of the permission slip policy at M.C.I., Cedar Junction. Nevertheless we think that these cases were soundly decided in reason and in policy, and with appropriate regard for the prisoners' constitutional rights. We further conclude that the policy at issue in this case is clearly constitutionally permissible and, to the extent that the plaintiff's books were withheld because of his failure to comply with the policy, he has no grounds for complaint. In

short, the defendant Furtado was justified in withholding "The Hate Factory" because of the plaintiff's failure to submit a permission slip. However, it is also clear, for the reasons given in section 3, *infra,* that it was incorrect for Furtado to rely upon 103 Wal. 481.15.1, see note 6, *infra,* in classifying the book as contraband.

The plaintiff argues that even if the permission slip policy is constitutional, it has been applied to him in an arbitrary and discriminatory fashion. However, with regard to the books named in his complaint, he has shown no such course of conduct. We therefore cannot accept his contention that the policy is unconstitutional as applied to him.

For the foregoing reasons we affirm the allowance of summary judgment in favor of the defendants on the plaintiff's claim for unconstitutional interference with his incoming publications.

2. *Attorney-Client Correspondence.*

In his complaint the plaintiff alleged that a package of his incoming legal correspondence was opened and inspected outside of his presence. As a result of this violation of applicable prison regulations,[5] he contends that he was deprived of his constitutional rights of access to the courts and effective assistance of counsel. In an affidavit addressed to this claim, the plaintiff identifies a prison guard, who is not a defendant in

---

[5] The Walpole (now Cedar Junction) regulations challenged by the plaintiff are promulgated by the Department of Correction and appear in essentially the same form at 103 Code Mass. Regs. 481 (1983). The applicable regulations state: *103 Wal. 481.11* "1. All inmates shall be permitted to correspond in confidence regarding legal or official matters with the following persons: a) Any officer of a court of the United States or of the Commonwealth of Massachusetts (Judge, Attorney, Clerk)."

*103 Wal. 481.12* "2. All incoming Privileged mail shall be opened and inspected for contraband in the presence of the addressee by the Correction Officer in charge of the housing unit where the addressee resides. 3. Incoming inmate Privileged mail shall not be impeded in its transmission if it meets the following requirements: a) It bears the name and address of one of the persons listed in Subsection 1. of Section 481.11 on the outside of the envelope; and b) It is clearly labeled 'Confidential,' 'Privileged' or 'Attorney/Client.'"

Such regulations have been held to adequately safeguard the Sixth Amendment rights of prison inmates. *Wolff* v. *McDonnell,* 418 U.S. 539, 574-577 (1974).

this action, as responsible for opening and inspecting the correspondence. Because he fails to show that any of the four defendants was involved in or responsible for this action, they were entitled to summary judgment on the matter. In any event, since the plaintiff received the correspondence before commencing this action, the issue has been mooted. At most he would have been entitled to an award of nominal damages. See *Carey* v. *Piphus,* 435 U.S. 247, 262-264 (1978); *Kincaid* v. *Rusk,* 670 F.2d 737, 746 (7th Cir. 1982).

3. *Constitutionality of Mail Regulations.*

The plaintiff alleges that two sections of the prison's mail regulations pertaining to disapproval of incoming mail permit officials to censor mail in violation of the constitutional rights of inmates. Specifically, he contends that 103 Wal. 481.15.1 and 103 Wal. 481.15.5,[6] are unconstitutionally vague and

---

[6] The challenged regulations, as revised during the pendency of this action, are now identical to departmental regulations codified at 103 Code Mass. Regs. 481.15.1 and 481.15.5 (1983). The full text of the relevant regulations states:

*103 Wal. 481.15 — "Disapproval of Non-Privileged Correspondence*
"The Superintendent or his/her designee may disapprove for mailing or receipt by an inmate non-privileged correspondence the contents of which falls as a whole or in significant part into any one of the following categories:

"1. Information and materials which would create a significant threat to the security or order of the institution or to the physical safety of an individual;
"2. Threats or blackmail or extortion;
"3. Plans for sending contraband in or out of the institution;
"4. Plans to escape;
"5. Plans for activities in violation of departmental or institutional regulations, order[s] o[r] policies;
"6. Criminal activity or plans for criminal activity;
"7. Coded messages which are not reasonably decipherable by the reader, and
"8. Descriptions of making of any weapon, explosive, poison, or destructive devise.
"9. Graphic presentations of sexual behavior that are in violation of

overbroad, and that he, rather than the defendants, was entitled to summary judgment on this issue.

We shall first consider the constitutionality of 103 Wal. 481.15.1 which allows the superintendent or his designees to disapprove the receipt of nonprivileged correspondence which contains "[i]nformation and materials which would create a significant threat to the security or order of the institution or to the physical safety of an individual." The plaintiff argues that by failing to specify or define "a significant threat to the security or order," the regulation gives too much discretion to prison employees to determine for themselves what material warrants censorship. We agree.

In *Procunier* v. *Martinez*, 416 U.S. 396, 413 (1974), the United States Supreme Court held that "censorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. . . . [Prison officials] must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad." Applying these guidelines, the Court struck down overbroad

---

law, or materials which advocate or may lead to prohibited sexual activity."

*103 Wal. 481.16 — "Disapproval of Publications*

"1.  A publication received through the United States mail from a publisher or other approved vendor may be disapproved for receipt by the inmate only when it contains information which if communicated would create a significant threat to the security or order of the institution or to the physical safety of an individual, because it falls within one of the categories listed in 481.15.

"2.  Nothing in this section shall be construed as limiting the right of a Superintendent to limit the number of publications an inmate any [sic] possess at one time, or to impose a rule limiting publications to those received from a publisher or approved vendor such as a bookstore."

mail regulations which "fairly invited prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner mail censorship." *Id.* at 415.

In seeking to preserve prison security and order, 103 Wal. 481.15.1 meets the first criterion enunciated in *Procunier*. However, it fails to advance this goal in the least restrictive manner possible as evidenced by comparing the regulation to the unchallenged and more narrowly drawn sections of 103 Wal. 481.15.[7] The generality of 103 Wal. 481.15.1 provides little direction to those officials and employees charged with its enforcement. "While these reviewers may be well versed in the realities of prison life, some may not be so well attuned to the subtleties of the first amendment." *Jackson* v. *Ward*, 458 F. Supp. 546, 558 (W.D.N.Y. 1978). In *Hopkins* v. *Collins*, 411 F. Supp. 831, 834 (D. Md. 1976), a judge held that an analogous prison regulation, permitting censorship of mail which "directly or indirectly threatens the security, safety or order of the institution or its personnel," provided "insufficient guidance to officials, to inmates and to the latter's correspondents" and was therefore unconstitutional.

Prison regulations which have been held to meet the standards set out in *Procunier* narrowly define the types of correspondence that will constitute a censorable threat to security. See *Procunier, supra* at 414 n.14 & 416 n.15; *Gray* v. *Creamer*, 376 F. Supp. 675, 678, 683 (W.D. Pa. 1974). The defendants cite only *Meadows* v. *Hopkins*, 713 F.2d 206 (6th Cir. 1978) to support their contention that the challenged regulation is constitutional. However, the Federal prison regulations approved in *Meadows, supra* at 211,[8] like those implicitly

---

[7] See note 6, *supra*.

[8] In *Meadows, supra* at 209, the court approved Federal prison regulations which allow the warden to "reject correspondence sent by or to an inmate if it contains any of the following: (1) Matter that is nonmailable under law or postal regulations; (2) Information of escape plots, of plans to commit illegal activities, or to violate institutional rules; (3) Direction of an inmate's business; (4) Threats, extortion, obscenity, or gratituous profanity; (5) A code; or (6) Contraband. 28 C.F.R. § 540.13(e). The warden is required to notify the inmate in writing if any correspondence is rejected because of its content. The notice must clearly set forth the basis for the rejection of the mail. 28 C.F.R. § 540.12."

approved in *Procunier,* "delineate with specificity material which is deemed censorable. . . . Thus prison officials are not free to impose their own standards." *Id.* None of the approved regulations suffer from the vagueness and overbreadth of 103 Wal. 481.15.1.

For these reasons, we conclude that the plaintiff, rather than the defendants, was entitled to summary judgment as to the constitutionality of 103 Wal. 481.15.1. However, we are not persuaded that the same result is called for with regard to 103 Wal. 481.15.5 which allows for the disapproval of correspondence containing "[p]lans for activities in violation of departmental or institutional regulations, order[s] o[r] policies." We infer that 103 Wal. 481.15.5 applies to written and established regulations, orders, or policies so as to provide reasonable notice to prisoners and their correspondents of what material is subject to censorship. Comparable regulations have been approved in *Procunier, supra* at 417 n.15 (prohibiting letters concerning "plans for activities in violation of institutional rules") and in *Meadows, supra* at 209 (disapproving mail containing "[i]nformation . . . of plans . . . to violate institutional rules"). We hold that 103 Wal. 481.15.5 is sufficiently specific to satisfy the foregoing constitutional requirements. We therefore affirm summary judgment in favor of the defendants on this issue.

4. *Due process.*

The plaintiff also challenges the constitutionality of the prison's mail regulations on due process grounds. He alleges that, at the time of the actions complained of, the regulations did not require officials to provide timely notice of the reasons for confiscating incoming correspondence nor did they afford inmates the right to a hearing or opportunity to appeal censorship decisions. The defendants assert that an adequate grievance system was in effect at all relevant times, pointing to the plaintiff's successful protest against the defendant Furtado's classification of "The Hate Factory" as contraband. In moving for summary judgment the defendants argued that revisions of prison regulations made in the course of this litigation had mooted the plaintiff's claim by establishing a specific notice

requirement and by codifying a procedure for appealing censorship decisions. We conclude that the revised regulations[9] provide the constitutionally required procedural safeguards, and therefore the plaintiff has no grounds to seek additional relief.

In *Procunier* v. *Martinez,* 416 U.S. 396, 418-419 (1974), the Court held that decisions to censor inmate correspondence must be accompanied by minimal procedural safeguards. The Court required that "an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence." The regulations appearing in 103 Wal. 481.17 (see now 103 Code Mass. Regs. 481.17 [1983]) clearly satisfy these requirements and provide even greater protection by allowing inmates — and not just their correspondents — the right to appeal a censorship decision and by setting prompt time limits for decisions following appeals. Although the plaintiff claims he is entitled to a hearing before a publication is classified as contraband, *Procunier* does not require such a procedure nor do we conclude that a pre-censorship hearing is required by the Massachusetts Declaration of Rights.

---

[9] The relevant regulation appears in 103 Wal. 481.17, which states:

"1.  When any mail, or a portion thereof, including publications and correspondence, addressed to an inmate is received at the institution but is not delivered to the inmate for reasons set forth in Section 481.15 above, the inmate and the sender shall be promptly notified of the following:

    "a)  The reason for refusing to deliver the mail or a portion thereof to the inmate;

    "b)  The fact that a written appeal may be submitted by the inmate or sender to the Deputy Superintendent of Operations.

"2.  The Deputy Superintendent for Operations shall within five (5) working days of the receipt of such an appeal, make a decision and notify the appellant or refer the appeal to the Superintendent.

"3.  The Superintendent shall, within five (5) working days of the receipt of such an appeal, make a decision and notify the appellant."

Because 103 Code Mass. Regs. 481.17 (as well as 103 Wal. 481.17) adequately safeguards the procedural rights of inmates, there is no reason to grant the plaintiff the injunctive relief he seeks. See *Sherman* v. *MacDougall,* 656 F.2d 527, 528 (9th Cir. 1981) (where revised prison censorship regulations provided due process, no reason to order additional remedy); *Nolan* v. *Fitzpatrick,* 451 F.2d 545, 551 (1st Cir. 1971) (revised mail regulations eliminated need for injunctive relief).

5. *Attorneys' Fees.*

In his complaint the plaintiff requested an award of attorneys' fees pursuant to 42 U.S.C. § 1988 (1982) and G. L. c. 12, § 11I (1984 ed.). Under both the Federal and State statutes, the prevailing party in a civil rights action may seek an award of "reasonable attorneys' fees." The defendants contend that the plaintiff is not entitled to fees because he is represented by law students at the Prisoners' Legal Assistance Clinic, Western New England College School of Law, who are practicing by leave of this court pursuant to S.J.C. Rule 3:04, as appearing in 382 Mass. 760 (1981). The plaintiff did not, either by motion or brief, request an award by this court of fees incurred in pursuing his appeal, although the defendants answered that no fees should be allowed. We therefore treat the matter as waived under G. L. c. 12, § 11I (1984 ed.). Because the timeliness of requests for attorneys' fees under 42 U.S.C. § 1988 (1982) may be subject to local court rules, *White* v. *New Hampshire Dept. of Employment Sec.,* 455 U.S. 445, 454 (1982), we reach the same conclusion with regard to an award of appellate fees under that statute. We do not comment on whether the plaintiff may be entitled to recover attorneys' fees for trial services. We note only that where a fee award is authorized by statute, the value of law student services may be compensable provided the students were supervised by an attorney. *Darmetko* v. *Boston Hous. Auth.,* 378 Mass. 758, 765 (1979). The record in this case does not reveal the nature of the law student services relied upon by the plaintiff.

*6. Summary.*

In conclusion, we affirm the judge's order of summary judgment for the defendants with respect to the plaintiff's claim that they withheld incoming books for which he failed to submit the required permission slips, as well as the plaintiff's claim of unconstitutional interference with his legal correspondence. Finally, declarations are to be entered that 103 Wal. 481.15.5 and 103 Wal. 481.17 are constitutional, and that 103 Wal. 481.15.1 is unconstitutional.

*So ordered.*