## Massachusetts Municipal Wholesale Electric Company *vs.* City of Springfield & others.[1]

No. 97-P-1399.

Worcester. May 25, 1999. - April 13, 2000.

Present: Armstrong, Perretta, & Gelinas, JJ.

*Practice, Civil,* Summary judgment, Damages. *Contract,* Performance and breach, Construction of contract. *Municipal Corporations,* Water rates. *Public Utilities,* Costs of service.

In an action brought by an electric company against a municipality for the municipality's breach of an agreement to provide water to be used for generating electricity, the judge properly determined as matter of law on the company's motion for summary judgment that the municipality had breached the agreement and that the issue of costs as a component of rate increases did not need to be determined at a trial [110-112], and that rate increases imposed by the municipality were discriminatory [112-113].

In an action for breach of contract, properly determined on a motion for summary judgment, the award of damages for a certain period of the contract was recalculated in accordance with the uncontroverted evidence. [113-114]

Civil action commenced in the Superior Court Department on June 30, 1994.

The case was heard by *Thayer Fremont-Smith*, J., on motions for summary judgment.

*Robert Aronson* (*Norman J. Guz, Jr.*, with him) for the defendants.

*Robert M. Granger* for the plaintiff.

Gelinas, J. After hearing, a Superior Court judge allowed Massachusetts Municipal Wholesale Electric Company's (variously MMWEC or plaintiff)[2] motion for summary judgment and

[1]Board of Water Commissioners of Springfield and Water and Sewer Commission of Springfield. We shall refer to the defendants collectively as the city.

[2]MMWEC is a public corporation and a political subdivision of the Commonwealth, created by St. 1975, c. 775. It was established to plan, finance,

denied the city's cross-motion for summary judgment; the hearing judge also denied the city's motion for reconsideration. We review the allowance of summary judgment to determine whether, viewing the materials in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as matter of law. Mass. R.Civ.P. 56(c), 365 Mass. 824 (1974). See *Leavitt* v. *Mizner*, 404 Mass. 81, 88 (1989); *Yakubowicz* v. *Paramount Pictures Corp.*, 404 Mass. 624, 626 (1989). We may consider any ground supporting the judgment. *Champagne* v. *Commissioner of Correction*, 395 Mass. 382, 386 (1985). *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). We determine that the city, opposing the motion, had no reasonable expectation of proving an essential element of its case. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). *Judson* v. *Essex Agric. & Technical Inst.*, 418 Mass. 159, 162 (1994). We affirm the judgment of the Superior Court, modifying only the amount of damages.

Needing a large supply of water for use in generating electricity that it then sold to member Massachusetts municipal light departments, MMWEC entered into an agreement in 1978 to purchase water from the city. The 1978 agreement contained an appendix (Appendix A) establishing the rates to be charged for the water. According to the agreement, the city could amend Appendix A once each year, and rates might be increased "to reflect general increases in the City's costs," but in no event could the rates in any one year "be greater than the rates as shown on Appendix A as amended for that year."

The 1978 agreement was to be effective for a period of twenty years, beginning January 1, 1981, and ending December 31, 2001. The rates charged under the agreement, established in the original Appendix A, remained unchanged through 1988.

Three rate increases, which form the basis of this litigation, were then initiated by the city. The first occurred on January 1, 1989, when the city raised MMWEC's rates by fifty per cent,

_____

and acquire electric power resources on behalf of its member municipal light departments. To this end it financed, constructed, owns, and operates the Stony Brook Energy Center, an electrical generating facility located in Ludlow, Massachusetts. Almost ninety-five per cent of the electric power generated at Stony Brook is sold under power sales agreements to Massachusetts municipal light departments. MMWEC's water costs are incorporated in the rates charged municipalities by MMWEC.

from an average of approximately twenty-two cents to thirty-three cents per hundred cubic feet (CCF) of water. The second raise, initiated on July 1, 1989, and apparently in contravention of the agreement's provision that rates could not exceed those established by Appendix A as amended in any one year, increased the rate from approximately thirty-three cents to slightly over fifty cents per CCF. The final raise, implemented as of the October 1, 1991, billing,[3] increased MMWEC's rates to $1.09 per CCF. That rate was rescinded on January 1, 1992, when the city reduced the rate to ninety-nine cents per CCF, where it remained through initiation of this litigation. The cumulative effect of these increases was to raise MMWEC's rates by approximately 350 per cent. Concurrently, the city's other customers also experienced rate increases. Residential customers in both Springfield and Ludlow saw their rates increased by about one hundred per cent, from fifty cents to ninety-nine cents per CCF. Rates for industrial customers in Springfield increased, effective as of the April 1, 1991, billing, from twenty-two cents to thirty-six cents per CCF, or approximately sixty-three per cent. Wholesale rates, based on charges per million gallons, increased from $400 to $479 per million gallons, an increase of approximately twenty per cent.[4]

In January, 1992, MMWEC appeared before the city's board of water commissioners (board) to protest the inequity of the rate increases. Fruitless negotiations followed, and MMWEC instituted this action challenging the three rate increases in the period 1989 through 1991, and the rates charged by the city from January 1, 1992, forward. The appeal claims four principal errors, which we discuss in turn.

1. *Breach of the agreement.* The city claims that it was error for the judge to determine, as matter of law, that it had breached the 1978 agreement. It contends that the judge improperly limited the definition of "costs" to expenses already incurred and excluded from "costs" amounts needed for future capital improvements. The city contends that the components of what the parties intended in the definition of "costs" were a matter of fact, resolution of which required trial. We think the judge was right.

---

[3]Bills were issued, on a quarterly basis, for water supplied in the previous quarter; rate increases were thus retroactive for one quarter.

[4]A rate of $479 per million gallons equals a rate of thirty-six cents per CCF. Springfield's industry was thus being charged at the then prevailing wholesale rate.

The judge properly construed the term "costs" according to its usual and ordinary meaning. Interpretation of language in a written contract is a question of law for the court, and if the words are plain and free from ambiguity, they must be construed in accordance with their ordinary and usual sense. See *Ober* v. *National Cas. Co.*, 318 Mass. 27, 30 (1945); *Edwin R. Sage Co.* v. *Foley*, 12 Mass. App. Ct. 20, 28 (1981). Evidence may be reviewed that elucidates the meaning of a contract term. *Kobayashi* v. *Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 496-497 (1997). Considering the undisputed evidence offered in the summary judgment materials on this basis, in the light most favorable to the nonmoving party, *Colley* v. *Benson, Young & Downs Ins. Agency, Inc.*, 42 Mass. App. Ct. 527, 528 (1997), the term "costs" as applied by the judge included all costs supported by the evidence before him. The city maintains that in his interpretation of the term, the judge excluded any amounts attributable to capital improvements. Contrary to this assertion, the judge's ruling did not exclude all capital improvement expenses. Rather, the evidence showed, and the judge ruled, that the city failed properly to identify and provide for specific future capital improvement expenses in its accounting procedures and thus in its rate structure. Both at the trial court hearing and on appeal, the city simply listed numerous capital projects proposed for possible future implementation, without establishing an estimate of their cost and without making specific provision for them in the accounts established for the water business. On the basis of this evidence, the judge properly concluded as matter of law that at the time of the rate increases, any attempt to assign costs to those capital projects was speculative.[5] The evidence further showed that the city had changed one account, originally identified as a "capital improvement account," to an undifferentiated "retained surplus" account. The city provided no evidence relating this amount to its "costs" in any way, especially as regards the rate charged MMWEC.[6] The

[5]See note 7, *infra.*

[6]The city had retained a consulting firm, Camp, Dresser and McKee, Inc. (CDM), to determine its rates for 1989 to 1992. The city then retained Consultants to Management, Inc., to prepare a report (CMI report), in evidence before the judge, reviewing the methodology used by CDM to determine rates. This report concluded that "[t]he $4,600,000 three year average capital improvements estimate was overly optimistic and caused the water rates to be higher than they could have been." This amount was included in the rates charged all

retained surplus was significant,[7] and there was no particular future project with which it was identified. Nothing in the judge's decision precludes the city from planning future capital improvements, developing their associated projected costs in a specific way, and including those specific costs in an amended rate schedule, applicable to all ratepayers.

2. *Discriminatory rates.* The city claims that the judge erred in ruling that, as matter of law, the rate increases imposed on MMWEC were discriminatory. We disagree.

The enabling legislation under which the city operated its water department, and later its water commission, required that the city, as a part of its franchise, furnish water to Ludlow, where MMWEC's generating plant is located.[8] Like customers, located in a utility provider's franchise area, are entitled to nondiscriminatory treatment in the matter of rates. *Weld* v. *Gas & Elec. Light Commrs.*, 197 Mass. 556, 557 (1908). *Brand* v. *Water Commrs. of Billerica*, 242 Mass. 223, 226-227 (1922) ("The modern tendency undoubtedly is to regard discrimination by such corporations as inconsistent with the duty owed to, and the corresponding legal right in, the public. But even at common law it is generally recognized that discrimination of rates is permissible, within reasonable limits, *except as between consumers who receive the same service under similar conditions* [emphasis supplied]. This is especially true in cases of water, gas and like companies . . ." [citations omitted]). Viewing the evidence in the light most favorable to the city, there was no difference in the cost of supplying water to different industrial ratepayers in the franchise area.[9] The city's written opposition to MMWEC's motion for summary judgment stated that the city's "motivation in charging a higher rate for

---

ratepayers. The CMI report further concluded that the "[u]nappropriated surplus" could be used to offset future rate increases, to lower rates, or for unspecified capital improvements. The report further concluded that "the highly speculative capital improvements resulted in higher rates than necessary to cover costs. However, any excess revenues over expenses becomes surplus."

[7] At the end of 1992 this account stood at $20.8 million; by the end of 1996 the account had improved to $28 million.

[8] Statute 1889, c. 368, establishing the water franchise, provides in pertinent part that Springfield "shall also furnish to residents of [Ludlow] . . . the same privileges and facilities in and for the use of its water [as are] furnished to the residents of said city of Springfield."

[9] In its rate analysis, the city's CMI report identified no distinction with regard to provision of service to any individual customers. Differentiation was

industrial use to outside industrial users was to keep Springfield attractive to new and existing business." While such a goal, to keep existing industries and to encourage industrial development within its boundaries, might be laudable, the city's control of the water supply to this end was discriminatory. The enabling statute, requiring provision of water to those in other communities within its franchise area "so long as [the city] can do so without injury,"[10] cannot be read to support a rate differential that benefits the city at the expense of other communities in the franchise area, and more especially, to the detriment of MMWEC's numerous municipal electric ratepayers across the State, who would bear an additional cost in order to contribute to the city's industrial development program. Rate differentials are recognized and permitted, but they must be based on either the increased costs, or other circumstances, of providing the utility to the specific customer. See *Ladd* v. *Boston*, 170 Mass. 332, 336 (1898) (difference in providing no metered service); *Brand* v. *Water Commrs. of Billerica, supra* at 227; *Flatley* v. *Malden*, 40 Mass. App. Ct. 38, 40-41 (1996) (master-metered apartment complex). The city argues that whether such conditions exist is a question of fact to be decided at trial. The mere assertion that such conditions might be found, absent factual material on which the assertion might be proved, is not sufficient to defeat summary judgment. *Community Natl. Bank* v. *Dawes*, 369 Mass. 550, 554 (1976). *LaLonde* v. *Eissner*, 405 Mass. 207, 209 (1989). The city has made no such showing here.

3. *The damage award.* We agree with MMWEC's contention that we should not consider materials on damages not available to the trial judge at the summary judgment hearing. See *Currens* v. *Board of Assessors of Boston*, 370 Mass. 249, 253-254 (1976). We further see no error in the judge's denial of the city's motion for reconsideration. We do, however, review the calculations accepted by the trial judge, using the formulae adopted by him in establishing damages. Basing his award on the affidavit of Joseph Roy, the judge first awarded damages for the period January 1, 1989, to June 30, 1991, reducing the actual amount charged MMWEC to the amount that would have been charged, had the city increased the rate only by its allow-

---

based solely on the class of customer segments (retail, industrial, wholesale, etc.).

[10]Statute 1889, c. 368, § 5.

able costs under the terms of the agreement. That calculation yielded an effective rate of .28 cents per CCF for water supplied in the time period. However, the uncontroverted evidence of the CDM study, confirmed by the CMI report that was before the court on the motion for summary judgment, established that from the period beginning January 1, 1991, the city would have been allowed, under the agreement, to charge a rate of .36 per CCF. The difference between the damages awarded for this period and the allowable rate is $8,051.70, and we reduce the damage award by that amount.

4. *Denial of summary judgment.* Given the foregoing, there is no merit to the city's claim that the judge erred in denying its motion for summary judgment.

Accordingly, as to damages, interest, and costs only, the judgment is vacated and the case remanded for recalculation of those elements in accordance with this decision. The balance of the judgment and the order denying the defendant's motion for reconsideration are affirmed.

*So ordered.*