COMMISSIONER OF CORRECTION & another *vs.*
KENNETH MYERS.

Suffolk.  September 13, 1979. — November 19, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Moot Question.   Constitutional Law,* Right to refuse medical treatment. *Imprisonment.*

This court expressed its opinion in an adversary proceeding respecting the legal authority of concerned public officials to compel the defendant, a prisoner, to submit to hemodialysis and medications necessary to life-saving treatment of a kidney disease, notwithstanding the facts that the defendant has been transferred from a medium security prison to a minimum security prison, the object of his original refusal of treatment, that he has received a kidney transplant, and that he has agreed to submit to any necessary hemodialysis; a resolution of the controversy is impelled in view of the defendant's past vacillating attitude toward treatment, illustrated by his refusal of dialysis since the prison transfer, the possibility that the kidney transplant may not be success-

ful, the necessity for the defendant to cooperate, and the public importance of the issue.  [260-261]

This court affirmed a Superior Court order that the Commissioner of Correction and the Department of Public Health have legal authority to use "reasonable force" to compel the defendant, an unmarried, mentally competent twenty-four year old male prisoner without dependents, who attempted to manipulate his placement within the prison system, to submit to hemodialysis and medications necessary to life-saving treatment of a kidney disease, a relatively complex procedure but not one involving heavy physical and emotional burdens, on the ground that upon the facts, on a balancing of the interests of the individual, primarily privacy and bodily integrity, and the interests of the State, primarily the preservation of life, the balance was tipped decisively in favor of authorizing treatment without the defendant's consent by the State's interest in upholding orderly prison administration, particularly the maintenance of proper discipline and supervision of inmates, and the elimination of a serious threat to prison and order and security which the State's failure to prevent a death would present.  [261-265]

CIVIL ACTION commenced in the Superior Court Department on December 1, 1978.

The case was heard by *Adams,* J., and was reported by him to the Appeals Court.  The Supreme Judicial Court granted a request for direct review.

*Robert H. Claridge* for the Commissioner of Correction.

*Jonathan Brant,* Assistant Attorney General, for the Department of Public Health.

*Joseph K. Mackey* for the defendant.

*Ronald B. Schram, John C. Kane, Jr., Daniel T. Roble, & Patrick R. Carroll,* for Massachusetts Hospital Association, Inc., amicus curiae, submitted a brief.

HENNESSEY, C.J.  This case was reported to the Appeals Court pursuant to G. L. c. 231, § 111, and Mass. R. Civ. P. 64, 365 Mass. 831 (1974), because the judge below found that it raised novel and important questions of law.  This court granted the plaintiffs' application for direct appellate review.

We first consider whether certain factual developments render the case moot.  We determine that they do not.

Thus, we must decide whether the Superior Court's order compelling an unconsenting, competent, adult prisoner to submit to life-saving hemodialysis treatments and related medications is consistent with the prisoner's interest in bodily integrity and right of privacy — considerations which authorized an individual to forgo life-prolonging chemotherapy treatment in *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728 (1977). We conclude that there is no conflict and therefore affirm the order.

The Commissioner of Correction (Commissioner) initiated these proceedings in the Superior Court, seeking both a declaratory judgment that he could compel the defendant to undergo hemodialysis and a temporary restraining order compelling the defendant to submit to the treatment. The court denied the temporary restraining order but scheduled an evidentiary hearing and appointed counsel to represent the defendant. Subsequent to the hearing, the court issued an order declaring that the Commissioner and the Department of Public Health, which had intervened as a plaintiff, possessed the legal authority to compel the defendant to submit to hemodialysis. However, the order denied without prejudice the preliminary injunctive relief in light of the defendant's continuing voluntary submission to treatment.

One month later, the Commissioner returned to court because the defendant was threatening to refuse his scheduled dialysis. In accordance with its prior declaration, the court issued an order stating that the plaintiffs could use any reasonable force necessary to restrain the defendant during the administration of dialysis and any other life-saving medications. The defendant, however, voluntarily submitted to treatment, and the order expired by its terms. Nevertheless, one week later, when the defendant again refused dialysis, the court issued a standing order authorizing coerced treatment.

The facts may be summarized as follows. The defendant Kenneth Myers is an unmarried, mentally competent, twenty-four year old male. Since April 26, 1976, he has been serving several concurrent seven to ten year sentences

in Massachusetts correctional institutions. At the time of the proceedings below, the defendant was incarcerated at MCI Concord, a medium security institution.

While in prison, the defendant developed a kidney condition diagnosed as chronic glomeralo-nephritis and uremia. When the kidney condition worsened, the defendant began receiving hemodialysis, defined by testimony as a procedure whereby blood is pumped out of the body, cleansed of its toxins by a mechanical filtering process, and then returned to the body. See Schmidt's Attorneys' Dictionary of Medicine, D-38, H-27 (1977). The treatment was administered three times a week in sessions of four hours' duration, with an additional hour spent connecting and disconnecting the machine.

In addition to dialysis, the defendant received kayexalate, a medication that lowers the blood's potassium level. Kayexalate was normally prescribed only on week-ends, the longest periods between regularly scheduled dialysis, to alleviate the risk of sudden death from cardiac arrest. According to the estimates of Dr. Tai Jin Chung, the treating nephrologist, the defendant could survive only three to five days if he refused both dialysis and kayexalate, but he could survive ten to fifteen days if he took the medication alone.

For one year the defendant submitted to dialysis without significant complaint. However, on November 29, 1978, the defendant refused his regularly scheduled dialysis. He continued to refuse treatment the next day and, for a while, also refused the kayexalate medication. Although efforts were made to persuade him to accept dialysis, there was no attempt to treat him without his consent. The defendant finally consented to dialysis on December 1, after the Commissioner had filed his complaint. However, the defendant did not indicate a willingness to continue dialysis in the future and, in fact, threatened to refuse treatment at any time.

After the evidentiary hearing, the court concluded that the defendant's refusal of treatment had "little to do with his disease, the nature or effects of the dialysis treatment, or

the personal ramifications of continuing such treatment for the remainder of his life." His refusal was also unrelated to any religious objection to the treatments. Nor did the defendant wish to die. Rather, the court found that "Myers' refusal to take dialysis constitute[d] a form of protest against his placement in a medium, as opposed to a minimum, security prison." As found by the court, this protest stemmed from the defendant's belief that continued hemodialysis weakened him and reduced his ability to defend himself against other inmates.

In addition, the court found that dialysis was "relatively painless." The most significant pain, according to both Dr. Chung and the defendant, resulted from the initial administration of xylocaine, a local anesthetic. Although the treatment was frequently accompanied by such side effects as nausea, headaches, and physical exhaustion, the headaches and nausea resulted from high toxicity levels of the blood and consequently would occur even in the absence of treatment. The court also found that the defendant would be able to live an otherwise normal and healthy life if he continued to undergo dialysis. Moreover, the defendant was found to be a good candidate for a kidney transplant, an operation that could restore him to complete health.

The court's finding with regard to the possibility of coerced administration of dialysis was based on testimony of Dr. Chung and Shattuck Hospital Correctional Unit Director Bruce R. Martin. Dr. Chung testified that medical ethics demanded that everything possible be done to dialyze the defendant "up to the point we cannot technically manage it." Nonetheless, he admitted that he had never administered dialysis to an unwilling patient nor heard of others doing so and that it was not possible to use a general anaesthetic to subdue a patient. Dr. Chung also testified that in the unlikely but conceivable event that the patient's struggling dislodged one of the needles connected to his arm, three to four minutes loss of blood could prove fatal. Nevertheless, the court found that employing a combination of mechanical and human restraints, as described by Martin, would

provide "a feasible, if not completely risk-free, means of physically immobilizing the recipient so that involuntary treatment could be accomplished."

It was within the foregoing factual context that we granted the petition for direct appellate review. Subsequent to the Superior Court's order, the defendant was transferred to a minimum security facility, the object of his original refusal of treatment, and received a kidney transplant. Although the success of the transplant cannot be finally determined until March, 1980, the defendant's doctor has stated in an affidavit that it is "more likely than not that [Myers] will never again need [hemodialysis] treatment." In addition, the defendant has agreed to submit in the future to any necessary hemodialysis. On the basis of the preceding factual developments, the defendant argues that the case has become moot and should therefore be dismissed.

Although he acknowledges the significant changes in the facts, the Commissioner points to two other new facts relevant to the mootness question. The first is that the defendant's chances of retaining the functioning transplanted kidney are wholly dependent on his taking two prescribed medications, prednisone and imuran, on a daily basis. Thus, upon the defendant's refusal of essential medication or upon his body's rejection of the transplanted kidney, the case could return to its posture prior to the transplant. Also substantiating the Commissioner's claim that the case is not moot is the fact that the defendant's subsequent transfer to a minimum security facility did not terminate his refusals of dialysis. In light of that fact and the defendant's past unpredictable behavior, the Commissioner asserts that he cannot rely on the defendant's pledge to cooperate with essential treatment but must depend on the Superior Court's authorization of treatment without consent.

1. We agree with the Commissioner's arguments and do not treat the case as moot. The defendant's vacillating attitude toward treatment in the past, the possibility that the kidney transplant may not be successful, and the necessity

for the defendant to cooperate in taking supportive medications, all combine to make this a viable case. Even assuming arguendo that the case is factually moot, the question of the right of prisoners to refuse life-saving treatment in what amounts to an emergency situation is one "of public importance, capable of repetition, yet evading review." *Superintendent of Worcester State Hosp.* v. *Hagberg,* 374 Mass. 271, 274 (1978). Other instances of inmate refusal could become factually moot by the mere passage of time before appeal, either because the untreated prisoner has died or because he has voluntarily submitted to treatment. Moreover, the issue having been fully argued before us in an adversary proceeding,[1] we think it appropriate that we express our opinion. *Id. Karchmar* v. *Worcester,* 364 Mass. 124, 136 (1973). *Wellesley College* v. *Attorney Gen.,* 313 Mass. 722, 731 (1943).

2. We turn now to the merits of the case. Our decision in *Superintendent of Belchertown State School* v. *Saikewicz,* 373 Mass. 728 (1977), delineated in broad outlines the law regarding involuntary life-saving medical treatment. There we recognized that "a person has a strong interest in being free from nonconsensual invasion of his bodily integrity." *Id.* at 739. Similarly, we acknowledge that individuals have a constitutional right of privacy, arising from a high regard for human dignity and self-determination, and that this right may be asserted to prevent unwanted infringements of bodily integrity. *Id.* at 739-740. However, this right is not absolute and, as we have held, may be enforced only "in appropriate circumstances." *Id.* at 739, 744-745. What set of circumstances will be deemed appropriate for the exercise of this privacy right depends on the "proper balancing of applicable State and individual interests." *Id.* at 744.

---

[1] Not only has the defendant filed a brief vigorously asserting his right to refuse treatment in the circumstances of this case, but the Department of Public Health, a plaintiff intervener, and the Massachusetts Hospital Association, Inc., as amicus curiae, have also taken this position in separate briefs.

We identified in *Saikewicz* four countervailing State interests that were potentially implicated by an individual's rejection of life-saving medical treatment: (1) the preservation of life; (2) the protection of the interests of innocent third parties; (3) the prevention of suicide; and (4) the maintenance of the ethical integrity of the medical profession. *Id.* at 741. As in *Saikewicz,* the governmental interests in protection of innocent third parties and prevention of suicide are not involved in the present dispute. The defendant is not married and has no children or other dependents; thus his death would not endanger the welfare and safety of others. Nor would his death from a refusal of medication or dialysis necessarily constitute suicide. Rather, his death would result from "natural causes" since he would not have "set the death producing agent in motion" with the "specific intent" of causing his own death. *Id.* at 743 n.11.

In contrast, the State's interest in the preservation of life is directly implicated here. Characterized as "the most significant of the asserted State interests," *id.* at 741, this particular concern was outweighed in *Saikewicz* by the crucial fact that the patient's leukemia was incurable and would soon cause death regardless of any medical treatment. As we observed, "[t]here is a substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where . . . the issue is not whether, but when, for how long, and at what cost to the individual that life may be briefly extended." *Id.* at 742.

Myers' prognosis contrasts sharply with that of Saikewicz. Although Myers' kidney disease prior to the transplant could be technically classified as "incurable,"[2] it clearly was not life-threatening in the sense that his "life [would] soon, and inevitably, be extinguished" regardless of the treatment he received. *Id.* On the contrary, continued dialysis and medication permitted Myers to live an otherwise normal

---

[2] Dialysis was described in testimony as a "life support system" rather than a "cure" for kidney failure.

and healthy life, and following the kidney transplant, daily medication presently provides the possibility of complete cure. Therefore, compelling Myers to take his medication, or, in the regrettable event that his body rejects the transplanted kidney, compelling him to submit to dialysis does not involve a situation where "heavy physical and emotional burdens" would be imposed "to effect a brief and uncertain delay in the natural process of death." *Id.* at 744. Consequently, the State's interest in the preservation of life is "quite strong" in this instance. See *Custody of a Minor,* 375 Mass. 733, 755 n.12 (1978).

Notwithstanding the foregoing considerations, the State's interest in the preservation of life does not invariably control the right to refuse treatment in cases of positive prognosis. *Id.* For example, in *Lane* v. *Candura,* 6 Mass. App. Ct. 377 (1978), the Appeals Court upheld the right of a competent adult to refuse a leg amputation that would save, not merely prolong, her life. The decisive factor in applying the balancing test in that case was the magnitude of the proposed invasion. *Id.* at 378 n.2.

Appropriately, the judge below focused on the magnitude of the invasion occasioned by hemodialysis. He appraised that invasion as "relatively slight," when compared to that involved in an amputation or in chemotherapy. We conclude, however, that the judge took too narrow a view of the intrusiveness of dialysis. Unlike the relatively simple and risk-free treatments of supportive oral or intravenous medications, dialysis exacts a significant price from Myers in return for saving his life. In spite of the fact that dialysis does not require the sacrifice of a limb or entail substantial pain, it is a relatively complex procedure, which requires considerable commitment and endurance from the patient who must undergo the treatment three times a week.

Taken together, the great deference accorded the State's interest in the preservation of life — an attiiude that *Lane, supra,* tempered but did not ignore — and the defendant's interest in avoiding significant, nonconsensual invasions of his bodily integrity yield a very close balance of interests.

What tips that balance decisively in the direction of authorizing treatment without consent is a consideration not directly involved in *Saikewicz* and *Lane* — namely, the State's interest in upholding orderly prison administration.

Although the fact of the defendant's incarceration does not per se divest him of his right of privacy and interest in bodily integrity, see *Coffin* v. *Reichard,* 143 F.2d 443, 445 (6th Cir. 1944), cert. denied, 325 U.S. 887 (1945), it does impose limitations on those constitutional rights in terms of the State interests unique to the prison context. See *Jones* v. *North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 132 (1977); *Pell* v. *Procunier,* 417 U.S. 817, 822 (1974). Among the governmental interests recognized in a prison setting are the preservation of internal order and discipline, the maintenance of institutional security, and the rehabilitation of prisoners. E.g., *Procunier* v. *Martinez,* 416 U.S. 396, 412 (1974). The Commissioner invokes these State interests by arguing, first, that the maintenance of proper discipline and the supervision of inmates mandate an authority to administer life-saving medical treatment without consent and, second, that the State's failure to prevent Myers' death would present a serious threat to prison order and security, not only by generating a possibly "explosive" reaction among other inmates, but also by encouraging them to attempt similar forms of coercion in order to attain illegitimate ends.[3]

In validating the substantial impact of these concerns on the balancing of individual and governmental interests, we acknowledge "the wide-ranging deference to be accorded the decisions of prison administrators." *Jones* v. *North Carolina Prisoners' Labor Union, Inc., supra* at 126. "[I]n the absence of substantial evidence in the record to indicate that the officials have exaggerated their response . . . ," *id.* at 128, it should not be gainsaid that correctional needs in a case such as this are urgent and ought to be given considerable weight, especially when the prisoner's refusal of life-

---

[3] See appendix for pertinent portions of the Commissioner's affidavit.

saving treatment is predicated on an attempt to manipulate his placement within the prison system.[4]

The final State interests lending support to our authorization of compulsory medical treatment in this case are the interests in maintaining the ethical integrity of the medical profession and in permitting hospitals to care fully for patients under their control. See *Saikewicz, supra* at 743-744; *Custody of a Minor*, 375 Mass. 733, 755 (1978). Dr. Chung testified that in these circumstances medical ethics would require trying "anything [technically] possible" to preserve the defendant's life. Although prevailing medical ethics concurred with our decision in *Saikewicz* that prolonging a life for a brief period did not justify the pain and suffering of chemotherapy, see *Saikewicz, supra* at 743-744, there is no indication from expert testimony that medical ethics would support a failure to employ life-saving procedures here where the traumatic cost to the patient is not inordinate and the prognosis is good. Cf. *Custody of a Minor, supra* at 736. Moreover, the Superior Court's order accords fully with medical ethics in that it authorizes the use of only such "reasonable force" as is necessary and does not require treatment contrary to good medical practice. Cf. *id.* at 755-756.

3. *Conclusion.* Our conclusion that the Commissioner of Correction and the Department of Public Health possess the requisite authority to compel an unconsenting, competent, adult prisoner to submit to medications and to hemodialysis, when such measures are reasonably necessary to save his life, is founded on a careful balancing of the relevant State and individual interests, the weight of which must be determined by the particular facts of each case.

As we acknowledged in *Saikewicz, supra*, an individual's interest in refusing life-saving or life-prolonging medical

---

[4] We note that the "purpose" for exercising a constitutional right "is a factor which prison officials may legitimately consider in determining whether [that exercise] is likely to be a disruptive influence, or otherwise detrimental to the effective administration of the . . . prison system." *Jones* v. *North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126 n.4 (1977).

treatment is grounded in his right of privacy and interest in bodily integrity. Given the magnitude of the medical invasion occasioned by dialysis, as opposed to medications alone, the defendant's interest in refusing dialysis is strong enough, despite the positive prognosis, to counterbalance the State's usually predominant interest in the preservation of life. The governmental interests in maintaining the ethical integrity of the medical profession and in permitting hospitals to care for those in their custody are not controlling, since a patient's right of self-determination would normally be superior to such institutional considerations. See *id.* at 744. However, the State's interest in upholding orderly prison administration tips the balance in favor of authorizing treatment without consent. Our evaluation of this interest takes account of the threat posed to prison order, security, and discipline by a failure to prevent the death of an inmate who attempts to manipulate his placement within the prison system by refusing life-saving treatment. Consequently, on the facts of this case, it is clear that the Superior Court judge correctly concluded that State interests override the defendant's refusal of life-saving treatment.

The order of the Superior Court compelling the defendant to submit to hemodialysis treatment and to take supportive medications, when those measures are necessary to maintain his life, is affirmed.

*So ordered.*

### APPENDIX.

After concluding that Myers was "not, at [that] time, a suitable candidate for transfer to a minimum security institution or a pre-release center," then Commissioner Frank A. Hall stated in his affidavit that in dealing with a prisoner such as Myers, he had only two options if the law gave him no right to compel submission to treatment:

"One would be to simply grant the demands. There would be great pressure for me to do this since the only other option is to let the man die. Nevertheless, submitting to the demands would be intolerable, because it

would violate my legal responsibilities (particularly, in this case, my duty to protect the public) and greatly undermine my ability to effectively and fairly manage the Department of Correction.

"In my opinion, to allow Myers, or other inmates in similar situations, to destroy themselves while in prison would create very serious practical problems in prison administration.

"One very serious practical problem is that it would be very difficult to make the prisoners, their families and the correction department staff understand that I had done everything legally possible to prevent a death of a prisoner in my charge. Faith in the correctional system's ability to protect inmates would be seriously undermined. More immediately, one could expect an explosive reaction by other inmates to the death and to the failure of the Commissioner to prevent it by simply releasing Myers to minimum security. In my opinion, such a reaction is much more likely in a situation where Myers is permitted to die, than where he is subjected to involuntary treatment to keep him alive.

"This current refusal by Myers to receive treatment is not an isolated case in the Department of Correction. A twenty year old inmate at MCI Concord, suffering from juvenile diabetes, has on at least two separate occasions, attempted to manipulate his medical condition for the purpose of avoiding punishment for disciplinary infractions. His refusals have taken the form of either refusing insulin, thereby running the risk of going into a diabetic coma, or not eating after receiving insulin, thus running the risk of going into insulin shock.

"An eighteen year old inmate at MCI Concord has recently been attempting to gain a transfer to a pre-release center by mutilating the surgical opening from his ileostomy and refusing medical care for the possibly life-threatening wound (or else accepting treatment, but only at the hospital of his choice.)

". . . .

"The Department of Correction (and particularly the Department's Segregation Unit and its maximum security protective custody blocks) houses a large number of people whose behavior is contrary to the ordinary assumptions about what people will do. If an explicit right to refuse life-saving treatment in prison for any and all reasons is recognized, it is my opinion that the Department will be faced with many cases of inmates mutilating themselves or otherwise deliberately putting themselves in danger of dying, and then refusing life-saving treatment in order to have demands met. As already mentioned, granting their demands is as unthinkable as letting them die.

"Whenever a prisoner refuses treatment in a life-threatening situation, the standard procedure for correctional administrators is to summon every available resource, including family members and the personal intervention of the superintendent or anyone else who has a chance of influ-

encing the inmate, to persuade him to change his mind and take the treatment. For this method to be successful, officials must have available the ultimate possibility of compelling treatment and inmates must understand that they do not have the right to refuse treatment in all situations. Furthermore, in my opinion, these crisis situations are less likely to arise if inmates are told that there is no blanket right to refuse life-saving treatment for non-medical reasons."