WILLIAM LANGTON & another[1] vs. COMMISSIONER OF
CORRECTION & others.[2]

No. 92-P-884.

Suffolk. December 14, 1992. - June 7, 1993.

Present: BROWN. PERRETTA. & FINE, JJ.

*Imprisonment*, Medical test, Enforcement of discipline. *Constitutional Law*, Cruel and unusual punishment. *Common Law. Practice, Civil*, Summary judgment, Appeal.

The Commissioner of Correction had authority under G. L. c. 124, § 1(*b*) and § 1(*g*), and G. L. c. 127, § 16, to compel prison inmates to submit to testing for tuberculosis pursuant to an order from the Department of Public Health under G. L. c. 111, § 81. [568-570]

An incarcerated prisoner has no constitutional right to refuse to be tested for tuberculosis; thus such a prisoner could not maintain a claim of violation of his civil rights by reason of compelled testing. [570-571]

In a civil rights case, prison inmates failed to demonstrate, for purposes of defeating a motion for summary judgment, the existence of any genuine issue of material fact as to whether they had been compelled to submit to an unlawful test for acquired immunodeficiency syndrome (AIDS) rather than a test for tuberculosis. [571-572]

Prison inmates claiming violation of the Eighth Amendment to the United States Constitution ("cruel and unusual punishments") by reason of the conditions under which they were tested for tuberculosis, did not allege sufficient facts in response to defendant prison and public health officials' motion for summary judgment and affidavits to demonstrate the officials' "deliberate indifference to a serious medical need" with regard to the conduct of the tests. [572-574]

There was no merit to the claims of plaintiffs in a civil action that the trial judge could not, in his discretion, consider unpublished judicial decisions from other jurisdictions for their persuasive value. [574-575]

In a civil action, the judge properly granted summary judgment in favor of all the defendants on the motion of some of the defendants, where the

---

[1]Al Therrien.

[2]The superintendent of North Central Correctional Center (NCCC); Robert Sadowski, John Beaton, and Stan Suchocki, correction officers at NCCC; Pauline Sweeney, Donna Peck, Jane Hauss, and Martha Kaulback, Department of Correction nurses; the Commissioner of Public Health; and Nancy Taylor, a Department of Public Health nurse.

plaintiffs received notice and opportunity for hearing sufficient to comply with the requirements of Mass.R.Civ.P. 56. [575-576]


CIVIL ACTION commenced in the Superior Court Department on December 3, 1990.

The case was heard by *Elbert Tuttle*, J., on a motion for summary judgment.

*Al Therrien*, pro se.

*Sondra M. Korman* (*John E. Bowman, Jr.*, Assistant Attorney General, with her) for the defendants.

*William Langton*, pro se, submitted a brief.

BROWN, J. This case is before us on an appeal by the plaintiffs, inmates in the custody of the Department of Correction (DOC),[3] from an order by a judge of the Superior Court granting summary judgment to each of the defendants pursuant to Mass.R.Civ.P. 56, 365 Mass. 824 (1974). The plaintiffs were seeking injunctive and declaratory relief[4] with respect to the constitutionality of procedures arising out of a mandatory tuberculosis testing program implemented by the DOC. The plaintiffs contend that the trial judge erred in allowing the defendants' motion for summary judgment because there were genuine factual issues raised as to (1) whether the defendants had the authority to require the plaintiffs to submit to the tests; (2) the purpose of the tests administered to them; and (3) the conditions under which the tests were performed. The plaintiffs also allege that the trial judge improperly relied upon unpublished opinions and granted summary judgment for all of the defendants where only some of them moved for summary judgment. We conclude that the trial judge's disposition of this case was correct in all respects.

The facts are as follows. In August of 1990, three inmates at Bay State Correctional Facility (Bay State) were diag-

---

[3]At all times relevant to this action, the plaintiffs were confined to the North Central Correctional Center, a medium security institution in Gardner, Massachusetts.

[4]The plaintiffs also requested punitive and compensatory damages.

nosed with active cases of tuberculosis. A fourth inmate was highly suspect for tuberculosis. After conducting routine skin testing and concluding that tuberculosis (TB) had been spread at Bay State, the State's public health officials determined that a potential public health emergency existed within the entire State prison system which required the immediate TB testing of all inmates and employees of the DOC.[5]

In the fall of 1990, in accordance with a Department of Public Health (DPH) directive, the Commissioner of Correction ordered that all inmates and DOC employees undergo a tuberculosis skin test (PPD skin test). The Departments of Correction and Public Health also conducted a series of educational programs throughout the prison system prior to commencing the TB testing.

Subsequently, all inmates and employees received TB tests in accordance with protocol established by the DPH. A control skin test (candida test), recommended by the Centers for Disease Control for high risk populations such as prisons, was also administered to the inmates at the same time as the PPD skin test. The candida test was used to determine whether an inmate's immune system was capable of responding to the PPD skin test, thereby minimizing "false negative" TB test results.

To ensure compliance with the TB testing program, the DOC established disciplinary procedures to deal with inmate refusals to participate. An inmate who refused to submit to the test would initially be counselled to take the test. If the inmate's protest continued, a disciplinary report could issue for failing to obey a direct order and the inmate would then be subject to the disciplinary process. The disciplinary process involved possible loss of good time credit, segregation, isolation, loss of visitation privileges, transfer to a higher

---

[5]Widespread testing was deemed necessary because some inmates housed at Bay State during the period of transmission had been routinely transferred to other correctional institutions and were, therefore, capable of spreading active TB to inmates at other facilities.

level of custody, and confinement to a punitive unit within the correctional facility.

In September, 1990, the plaintiffs were notified of the mandatory TB testing program and the possible consequences of noncompliance. Shortly thereafter, Langton submitted to the TB and candida tests. Therrien, however, refused to take the test. As a result, Therrien received a disciplinary report for "disobeying [an] order of, lying to, or insolence towards a staff member" and "violating any departmental rule or regulation[], or any other rule, regulation, or condition of [an] institution or community based program." After being counselled to take the test, Therrien complied.

The plaintiffs commenced this action pro se against the defendants in November, 1990, alleging deprivations of rights, privileges, and immunities secured by the United States and Massachusetts Constitutions. Specifically, the plaintiffs alleged that (1) one of the tests administered to them was actually a low level AIDS test which is prohibited by statute without the written consent of the person being tested; (2) the compelled TB tests were administered under unsanitary conditions which constituted cruel and unusual punishment; and (3) the compelled TB tests violated the plaintiffs' civil rights.

The plaintiffs later filed a motion for a temporary restraining order and preliminary injunction, seeking to prevent the DOC from performing additional TB tests on them.[6] That request for relief was denied.

The DOC defendants (see note 2, *supra*) filed a motion for summary judgment, supported by affidavits of various DOC and DPH employees. The judge allowed the motion, ruling that the "administration of [the TB and candida] tests to [the plaintiffs] was a proper exercise of the state's power over inmates within its prison population and that such testing violated none of the inmates' civil rights nor were the tests cruel and unusual punishment which is prohibited by the 8th

---

[6]The DOC continues to administer the TB test annually to all inmates as part of a surveillance program.

Amendment of the United States Constitution." The judge also concluded that, contrary to the plaintiffs' assertions, neither of the tests given to the plaintiffs was an AIDS test. This appeal is from the ensuing summary judgment.

1. *Motion for summary judgment.*

Summary judgment is a "device to make possible the prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts or if only a question of law is involved." *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 715 (1991), quoting from 3 Barron & Holtzoff, Federal Practice and Procedure § 1231, at 96 (Wright rev. ed. 1958).[7] This case fits nicely into that mold.

a. *Authority to compel testing.* The primary issue in this case is whether prison officials are authorized to compel inmates to submit to TB testing under State law. The plaintiffs argue that the defendants had no authority to force them to submit to the TB tests. They claim that the only time that the defendants are authorized to compel a medical procedure is where lifesaving medical treatment has been rejected. See *Commissioner of Correction* v. *Myers*, 379 Mass. 255 (1979). The trial judge ruled that the administration of the tuberculosis and control tests was a proper exercise of the defendants' authority over its prison population. We agree.

The DPH was authorized to mandate the TB testing of the plaintiffs. It has the authority not only to define diseases dangerous to the public health, but also to make rules and regulations necessary to control and prevent such diseases. See G. L. c. 111, § 6. It had declared TB to be a dangerous disease. See 105 Code Mass. Regs. §§ 300.001 (1988) & 300.100(41) (1986). Moreover, because of the dangerous nature of TB, the Legislature has given the DPH broad authority to conduct "programs aimed at controlling and eradicating tuberculosis in the commonwealth." G. L. c. 111, § 81, as appearing in St. 1961, c. 608, § 2. Under that statute the

---

[7]For the standard to be applied in deciding summary judgment motions, see, e.g., *Noyes* v. *Quincy Mut. Fire Ins. Co.*, 7 Mass. App. Ct. 723, 725-726 (1979).

DPH "may establish, foster, and give such aid and assistance as it deems necessary for the establishment and maintenance of out-patient and diagnostic facilities for tuberculosis within tuberculosis hospitals, in other institutions, or in collaboration with local boards of health." The statute makes clear that the DPH has the authority to determine the nature and scope of programs necessary to diagnose and treat those infected with TB in the Commonwealth.

The Commissioner of Correction has the responsibility to "maintain security, safety and order at all state correctional facilities . . . ." G. L. c. 124, § 1(b), as appearing in St. 1972, c. 777, § 5. To that end, the Legislature has given the Commissioner broad authority to "make and promulgate necessary rules and regulations incident to the exercise of his powers and the performance of his duties including but not limited to rules and regulations regarding . . . safety, discipline, . . . classification, education, . . . care, and custody for all persons committed to correctional facilities." G. L. c. 124, § 1(q), as appearing in St. 1972, c. 777, § 5. In light of these responsibilities, the Commissioner is obligated to take measures to protect the physical well-being of all persons in the care of the DOC. In addition, the Legislature has specifically mandated that, during each prisoner's physical examination, "special attention shall be given to determining the presence of communicable diseases, particularly . . . pulmonary tuberculosis." G. L. c. 127, § 16, as appearing in St. 1957, c. 777, § 9.

The implementation of the mandatory testing program was a swift measure intended to avert a potential public health crisis in correctional facilities throughout the Commonwealth. TB is a highly infectious disease caused by airborne transmission of tubercle bacilli. Because of overcrowded conditions and close quarters, prisons are high risk environments for the transmission of TB. Given the nature of the disease and the potential threat to prison populations, DPH and DOC officials were properly concerned when they detected

three cases of active TB[8] at Bay State. They appropriately and lawfully implemented the mandatory TB testing program in order to halt the spread of the disease as quickly as possible.[9]

In addition, the plaintiffs had no constitutional right to refuse the TB tests. Although an inmate's incarceration does not divest him of his right of privacy and his interest in preserving his bodily integrity, it does limit those constitutional rights when the State's interest in prison security and administration is at risk. *Commissioner of Correction* v. *Myers*, 379 Mass. at 264. A State's interest in the preservation of life and upholding orderly prison administration may outweigh an inmate's privacy rights. *Id*. at 262, 266. Here, the DPH and the DOC determined that the potential spread of TB posed a dangerous threat to the administration of the entire prison system. Therefore, any right that the inmates had to refuse the TB test was outweighed by the State's interest in maintaining the health of its prison population and the orderly administration of the prison system.

The plaintiffs also claim that they were compelled to submit to the PPD skin test and the candida test "under threats, intimidation and coercion," in violation of their civil rights under the Massachusetts Civil Rights Act, G. L. c. 12, § 11I. To establish a claim under the Massachusetts Civil Rights Act, the plaintiffs must prove that their exercise or enjoyment of rights secured by the Constitution or laws of the United States or the Commonwealth was interfered with or attempted to be interfered with by "threats, intimidation or coercion." *Bally* v. *Northeastern Univ.*, 403 Mass. 713, 717 (1989). See G. L. c. 12, §§ 11H & 11I, as inserted by

---

[8]TB exists in the dormant and active stages. In the dormant phase, an individual is infected but not necessarily infectious to others. In the active phase, the infection breaks down into disease within the lungs, causing infectiousness.

[9]Further evidence of the DOC's and DPH's broad authority to impose medical procedures on a person in the custody of the DOC to prevent the spread of TB is found in G. L. c. 111, § 121, which provides that a prisoner with pulmonary tuberculosis (regardless of his or her consent) shall be placed under medical treatment and, if necessary, be isolated until the danger of contagion has passed.

St. 1979, c. 801, § 1. As we have found that no rights of the plaintiffs were violated by the mandatory TB testing program, they fail to meet the first prong of the test, and further inquiry into their civil rights violations claim is not necessary.

b. *Purpose of the tests.* The plaintiffs claim that there is a factual dispute as to whether one of the tests administered to them was in fact a test for AIDS. In opposition to the defendants' motion for summary judgment, the plaintiffs provided the court with a document titled "Exposure of Concern Information Sheet for Department of Correction Employees" which states that "[a]nother way of assessing T4 function[10] is by doing skin tests, like the TB skin test, but to substances that we know should cause a reaction: if no reaction occurs, then some immune deficiency exists as it is the T4 cell that is responsible for skin test reactions." Based on this document, the plaintiffs urge this court to find that one of the tests given to them was an illegal AIDS test,[11] rather than a test for TB and "to reduce the number of 'false negative' TB [test results] . . . [by] confirm[ing] that the patient's immune system was able to react to skin tests," as explained in an affidavit submitted by the defendants.[12]

In order to create a genuine issue of material fact as to whether they were illegally tested for AIDS, the plaintiffs must demonstrate by *"specific facts"* (Mass.R.Civ.P. 56[e], 365 Mass. 825 [1974]) that one of the tests that they were given was actually an AIDS test or arguably constituted an AIDS test because substances contained in the test were specifically designed to search for the HIV antigen or antibody or other indicators of AIDS infection. They have failed to do

---

[10]The document explains, "The function of the immune system in HIV positive people can be evaluated by doing a blood count of the T4 cell . . . ."

[11]General Laws c. 111, § 70F, prohibits administration of the HTLV-III test, which determines the presence of the HIV antibody or antigen, without first obtaining the written informed consent of the person being tested.

[12]If a person's immune system is weakened (whether from cancer, HIV or other diseases), there is an increased chance that the TB test will be negative and TB infection will be undetected.

so. The "Exposure of Concern" document merely explains that a test similar to the TB skin test can be used to determine whether a person suffers from AIDS. The document provides no specific evidence that either of the tests actually administered to the plaintiffs was intended to discover whether an inmate suffered from AIDS. The fact that the test might indicate that an inmate's immune system was depressed (by any of a number of maladies which inhibit the immune system) is insufficient to meet the plaintiffs' burden. The plaintiffs have made no showing that they were given an AIDS test, nor have they presented a dispute of fact regarding the purpose of the tests sufficient to defeat the defendants' motion for summary judgment.

c. *Testing conditions.* The plaintiffs next argue that there was a dispute of fact as to whether the allegedly unsanitary conditions under which the tests were performed constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. According to the plaintiffs, the defendants exposed them in various ways to the danger of AIDS and TB by (1) compelling them to submit to needle injections in an unsterile environment; (2) compelling them to attend an instruction on TB in a closed area where some of the over 200 persons present were infected with TB; (3) failing properly to cleanse and sterilize the area to be injected; and (4) wearing the same rubber gloves while performing injections on hundreds of inmates. The plaintiffs claim that the "unwanted injections caused both of the [p]laintiffs' arms to bleed, discolor and further to become inflamed."

In order to establish an Eighth Amendment violation, a plaintiff must prove that the defendants' actions amounted to "deliberate indifference to a serious medical need." *DesRosiers* v. *Moran*, 949 F.2d 15, 18 (1st Cir. 1991), quoting from *Estelle* v. *Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is conduct that offends evolving standards of decency in a civilized society." *DesRosiers* v. *Moran, supra* at 18, citing *Rhodes* v. *Chapman*, 452 U.S. 337, 347 (1981). "In order to establish deliberate indifference, the complain-

ant must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain." *DesRosiers* v. *Moran, supra* at 19. "While this mental state can aptly be described as 'recklessness,' it is recklessness not in the tort-law sense but in the appreciably stricter criminal law sense, requiring actual knowledge of impending harm easily preventable." *Ibid.* Mere negligence does not "rise to the level a constitutional violation." *Miga* v. *Holyoke*, 398 Mass. 343, 349-350 (1986), citing *Estelle* v. *Gamble*, 429 U.S. at 105.

Here, the plaintiffs have failed to allege sufficient facts, in response to the defendants' motion for summary judgment and affidavits, to demonstrate deliberate indifference to a serious medical need. Without doubt, the plaintiffs have a right not to be exposed to the risk of TB or other serious contagious illnesses by the defendants' deliberate indifference to potentially risky testing conditions or procedures. However, although there is a dispute between the plaintiffs and the defendants regarding the conditions under which the tests were performed,[13] an affidavit submitted on behalf of the defendants by a registered nurse also states that a person who receives a PPD injection cannot become infected with TB by virtue of that injection. The plaintiffs have not alleged any facts in opposition which show that a person can become infected by that test or that simply a failure to clean and sterilize the area to be injected (if true) could cause infection with AIDS, and they have not shown that they were harmed in such a way by the allegedly unsanitary testing conditions. In addition, the plaintiffs have not shown that the defendants who performed the testing had the requisite state of mind or intent, i.e., that they desired wantonly to inflict pain upon the plaintiffs or that they showed deliberate indifference to a serious medical need. The conditions to which the plaintiffs were subjected, if their version of the facts is correct, may state a claim for negligence, but, as previously discussed, negligence is insufficient as the basis for a constitutional

---

[13]The defendants allege that the tests were conducted according to protocol established by the DPH.

claim of cruel and unusual punishment.[14] See *DesRosiers* v. *Moran*, 949 F.2d at 19. As the plaintiffs have failed to raise a genuine factual dispute regarding whether the conditions under which the tests were performed constituted a violation of the Eighth Amendment, summary judgment in this regard was appropriate.

*2. Reliance on unpublished opinions.*

The plaintiffs also take issue with the defendants' citation and presentation to the court of unpublished decisions, claiming that the use of such decisions is improper according to *Purvis* v. *Commissioner of Correction*, 29 Mass. App Ct. 190, 192 n.5 (1990). In *Purvis*, the court explained that the defendants' citation of a case decided pursuant to Rule 1:28 of the Appeals Court, as amended, 10 Mass. App. Ct. 942 (1980), was improper because "unpublished decisions of [the Massachusetts Appeals Court] are not to be relied upon or cited as authority in unrelated cases." See also *Lyons* v. *Labor Relations Commn.*, 19 Mass. App. Ct. 562, 566 & n.7 (1985), *S.C.*, 397 Mass. 498 (1986); *Wolbach* v. *Beckett*, 20 Mass. App. Ct. 302, 306 n.5 (1985). Here, however, the cases that the defendants cited and provided to the court were not unpublished decisions of the Massachusetts Appeals Court; they were unpublished decisions from other jurisdictions. Therefore, *Purvis* is inapposite.

Although the unpublished decisions cited by the defendants and relied upon by the trial court have no precedential value, the trial court has the discretion to consider them for

---

[14]It should also be noted that if the DOC and DPH had failed to institute measures to prevent the spread of active TB or AIDS, such failure may have constituted "deliberate indifference" in violation of the Eighth Amendment. See *DeGidio* v. *Pung*, 704 F. Supp. 922, 923, 959-960 (D. Minn. 1989), aff'd, 920 F.2d 525 (8th Cir. 1990) (prison officials' consistent pattern of reckless or negligent conduct in responding to inmates' exposure to active TB sufficient to establish deliberate indifference to serious medical need). See also *Ballard* v. *Woodard*, 641 F. Supp. 432, 436-437 (W.D.N.C. 1986), citing *Byrd* v. *Bennett*, 774 F.2d 1154 (4th Cir. 1985) (unpublished) (failure to provide proper medical care to prisoners regardless of consent could amount to a deliberate indifference giving rise to a constitutional claim).

their persuasive value. See *Commonwealth* v. *Hill*, 377 Mass. 59, 61 (1979).

3. *Grant of summary judgment as to DPH defendants.*

Finally, the plaintiffs claim that the trial court's grant of summary judgment as to all of the defendants even though only some of them so moved was erroneous. The DOC defendants moved for summary judgment in October, 1991, pursuant to Mass.R.Civ.P. 56(a), 365 Mass. 824 (1974). The DPH defendants did not separately move for summary judgment.[15]

Because rule 56 does not expressly authorize a court to enter summary judgment sua sponte against a party, some courts have held that summary judgment should not be entered without a party-generated motion.[16] Other courts have held that "[s]o long as the Court is careful to assure that the party against whom the judgment will be entered has sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted, it is not inappropriate for the Court to act on its own." *Capital Films Corp.* v. *Charles Fries Prod., Inc.*, 628 F.2d 387, 390 (5th Cir. 1980), citing *Kistner* v. *Califano*, 579 F.2d 1004 (6th Cir. 1978); *FLLI Moretti Cereali S.P.A.* v. *Continental Grain Co.*, 563 F.2d 563 (2d Cir. 1977); and 10 Wright & Miller, Federal Practice and Procedure § 2719, at 454 (1973).

This court has held that a "judge ha[s] the power, sua sponte, to enter full summary judgment [against the plaintiff, where the plaintiff moved for partial summary judgment and the defendants' response was directed only to the issues raised in the plaintiff's motion], provided that the parties had sufficient notice of his intention to do so, opportunity to submit affidavits, and a right to be heard on the matter." *Gamache* v. *Mayor of N. Adams*, 17 Mass. App. Ct. 291,

---

[15]The motion for summary judgment filed by the DOC defendants was supported in part by an affidavit of a DPH employee.

[16]See, e.g., *Choudhry* v. *Jenkins*, 559 F.2d 1085 (7th Cir.), cert. denied, 434 U.S. 997, 1088-1089 (1977); *Capital Films Corp.* v. *Charles Fries Prod., Inc.*, 628 F.2d 387, 390-391 (5th Cir. 1980).

295 (1983). See *FMR Corp.* v. *Boston Edison Co.*, 415 Mass. 393, 396 (1993). In the present case, although the DPH defendants did not separately move for summary judgment, we think the DOC defendants' motion for summary judgment provided the plaintiffs with sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted for both the DOC defendants and the DPH defendants. In fact, the plaintiffs' Memorandum of Law in Opposition to the Defendants' Motion for Summary Judgment addresses both the DOC and DPH defendants' alleged lack of authority to compel the TB testing. This is not a case where the plaintiffs were surprised by the court's grant of summary judgment. The notice and hearing policies of rule 56 were complied with and summary judgment was properly granted in favor of all of the defendants.[17]

*Judgment affirmed.*

---

[17]Deciding as we do, we need not discuss the merits of all the other claims raised by the plaintiffs.