STATE of North Dakota ex rel. Timothy
SCHUETZLE, Warden North Dakota
State Penitentiary, Plaintiff and Appel-
lee,

v.

August T. VOGEL, Defendant
and Appellant.

Civ. No. 950095.

Supreme Court of North Dakota.

Sept. 22, 1995.

Jean R. Mullen (argued), Assistant Attor-
ney General, Attorney General's Office, Bis-
marck, for plaintiff and appellee.

Lynn M. Boughey (argued), and Rozanna Larson, Boughey Law Firm, Minot, for defendant and appellant.

MESCHKE, Justice.

August T. Vogel appeals from a declaratory judgment allowing State Penitentiary officials to require Vogel to submit to diabetes monitoring of his blood sugar count and, if ordered by a physician, to forcibly administer food, insulin and other medications to Vogel to prevent deterioration of his health or premature death. We affirm.

Vogel is a 64–year–old penitentiary inmate with a release date of 2016 from his 90–year sentence for first degree murder. He was diagnosed with diabetes mellitus in 1982 and, by 1992, was regularly taking insulin on his own, with monitoring by the penitentiary nurses. In January 1993, the Parole Board granted Vogel an education release to attend Bismarck State College, and he was transferred to the Missouri River Correctional Center (MRCC), a minimum security facility, while he attended school. Under penitentiary rules, inmates can be placed at the MRCC if they are on work release, education release, or within two years of their release from the penitentiary. Vogel was also permitted to work at the Radisson Inn for practical experience to fulfill an educational requirement.

After completing his college coursework in May 1994, Vogel continued working at the Radisson Inn pending Parole Board review. In September, the Parole Board denied Vogel work release, and he was not given a parole date within the next two years. He was returned to the penitentiary on September 12, 1994 to continue serving his sentence.

The day after his return to the penitentiary, Vogel would not eat or take his insulin. Warden Timothy Schuetzle moved Vogel to the infirmary for observation, and informed him that if his health deteriorated to a dangerous condition, Vogel would be forcibly injected with insulin. Vogel requested and received a grievance hearing.

At the hearing, Vogel expressed his anger at being moved back to the penitentiary. When asked if a compromise could be reached, Vogel said he would resume eating and taking medication for his diabetes if a letter of apology were sent to his employer at the Radisson Inn explaining his absence, if he were returned to the MRCC, if he got his job back, and if he received $1,000 for "punitive" damages. Schuetzle contacted Vogel's employer for him, but denied the other requests, explaining to Vogel why they could not be granted. In an effort to placate Vogel, Schuetzle also offered to help him prepare a parole plan to present to the Parole Board in two years. Vogel refused. His grievance was denied.

Vogel was committed twice, in September and October 1994, to the Jamestown State Hospital for mental evaluation. The State Hospital concluded Vogel was competent and not suicidal. The treating psychiatrist reported Vogel "is a very stubborn, angry man who because of his life sentence ... has very little to lose and thus has asserted his control by refusing to eat at times and by refusing to take the insulin for his diabetes." Although he began eating again, Vogel continues to refuse to take his insulin.

Schuetzle brought this declaratory action to determine whether Vogel, as an inmate, could refuse medical care and, if so, whether his refusal waived his Eighth Amendment right to be free from cruel and unusual punishment. At the trial, Vogel testified that he refused to take insulin in September because he believed he was being harmed by taking too much insulin. The warden, medical director, and doctor for the penitentiary also testified. The doctor testified that, based on Vogel's varying blood sugar levels, Vogel was not controlling his diabetes through nonmedicinal alternatives. The doctor opined that Vogel's refusal to take insulin would increase his risk of heart attack, diabetic coma, kidney failure, eye problems, pain and numbness, and premature death at some point in the future. The medical director testified that an untreated diabetic's possible future need for cardiac bypass surgery and renal dialysis would be "extremely costly" to the penitentiary.

The trial court found a "serious medical need" for Vogel to continue with proper medication for his diabetes and concluded that

Vogel had not shown he was being overmedicated with insulin. The court found that Vogel is a "very stubborn man" who "is competent to make determinations about his medical care." The court further found, however, that Vogel's refusals to eat and to take his insulin were "an attempt to manipulate the system and an act of blackmail against prison officials" and that Vogel would have resumed eating and taking insulin if he had been permitted to return to the MRCC and to his job at the Radisson Inn. The court found that Vogel's current refusals to take insulin and be monitored stemmed from his "anger or defiance because he was not permitted to be housed at the MRCC or to work at the Radisson." Weighing Vogel's right to refuse medical treatment against the state's "legitimate penological interests in controlling inmate discipline and in preventing prisoners from blackmailing prison officials in order to gain specific advantages," the court concluded the state's interests "must prevail."

The court therefore ruled that Schuetzle could require Vogel to submit to monitoring of his blood sugar count and could administer food, insulin, or other medications ordered by a physician if necessary to prevent deterioration of his health or premature death. The court also ruled that the state would not be liable for any deterioration of Vogel's condition that occurred as a result of his voluntary refusal to eat or take medication for his diabetic condition.

On appeal, Vogel asserts that, as a competent prison inmate, he has an absolute right to refuse medical treatment regardless of his reasons for doing so. We disagree.

We first explain what is not present in this case. We are not faced with an individual in a persistent vegetative state who can be kept alive only by extraordinary means, or one who is in the last stages of a terminal illness. *Compare, e.g., Matter of Quinlan,* 70 N.J. 10, 355 A.2d 647, *cert. denied sub nom. Garger v. New Jersey,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976) (persistent vegetative state); *Superintendent of Belchertown v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977) (acute myeloblastic monocytic leukemia); NDCC 23–06.4–11(1) ("Death resulting from the withholding or withdrawal of life-prolonging treatment, nutrition, or hydration pursuant to a declaration and in accordance with this chapter does not constitute, for any purpose, a suicide or homicide."). Rather, this individual, by a deliberate course of conduct, will most likely cause himself serious harm or prematurely end his life, although relatively nonintrusive treatments for his disease would significantly reduce the likelihood of complications and resultant harm or death.

A competent person has a constitutionally protected liberty interest to refuse unwanted medical treatment. *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990). A person's interest in personal autonomy and self-determination is a fundamentally commanding one, with well-established legal and philosophical underpinnings. *See, e.g., Thor v. Superior Court (Andrews),* 5 Cal.4th 725, 21 Cal.Rptr.2d 357, 362–365, 855 P.2d 375, 380–383 (1993). But this right, like other constitutionally protected interests, is not absolute. As *Cruzan,* 497 U.S. at 279, 110 S.Ct. at 2852 (quoting *Youngberg v. Romeo,* 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982)), explains, whether a person's constitutionally protected liberty interest in refusing unwanted medical treatment has been violated " 'must be determined by balancing his liberty interests against the relevant state interests.' "

Ignoring the most relevant state interest here, Vogel would have us analyze this case apart from the prison setting where it arises. In a non-prison setting, the state interests that are generally identified as countervailing (but often subordinate) to the scope of a patient's autonomy include preserving life, preventing suicide, maintaining the integrity of the medical profession, and protecting innocent third persons. *See Thor,* 21 Cal.Rptr.2d at 365, 855 P.2d at 383. In the case of a prison inmate, though, the state has an "important interest in maintaining the confinement of the prisoner and the integrity of its correctional system [that] must also be considered" in the balance. *Matter of Adoption of J.S.P.L.,* 532 N.W.2d 653, 662 (N.D. 1995). *See also Washington v. Harper,* 494

U.S. 210, 222, 110 S.Ct. 1028, 1037, 108 L.Ed.2d 178 (1990) ("The extent of a prisoner's right under the [Due Process] Clause to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement."). *Compare Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (limiting prison inmates' recognizable liberty interests that are afforded procedural due process protection). As *Dept. of Public Welfare v. Kallinger*, 134 Pa.Commw. 415, 580 A.2d 887, 889 (1990), explains, as a convict, Vogel's rights are necessarily limited and restricted "because of the unique nature and requirements of prison custody."

█ Courts cannot condone a prisoner's manipulation of his medical circumstances to the detriment of a state's interest in prison order, security, and discipline. *See Thor*, 21 Cal.Rptr.2d at 371, 855 P.2d at 389; *Commissioner of Correction v. Myers*, 379 Mass. 255, 399 N.E.2d 452, 458 (1979); *In re Caulk*, 125 N.H. 226, 480 A.2d 93, 96 (1984); *Von Holden v. Chapman*, 87 A.D.2d 66, 450 N.Y.S.2d 623, 625 (1982); *Kallinger*, 580 A.2d at 890; *State ex rel. White v. Narick*, 170 W.Va. 195, 199, 292 S.E.2d 54, 58 (1982).[1] Thus, the "purpose" for refusing unwanted medical treatment "is a factor which prison officials may legitimately consider in determining whether [the refusal] is likely to be a disruptive influence, or otherwise detrimental to the effective administration of the ... prison system." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126 n. 4, 97 S.Ct. 2532, 2538 n. 4, 53 L.Ed.2d 629 (1977). Because the state's interest in orderly prison administration is the controlling factor here, we need not address other possible state interests in assessing the scope of this patient's autonomy.

The reasons behind this patient's refusal resemble those of a prisoner in *Myers*, 379 Mass. 255, 399 N.E.2d 452, where the commissioner of correction sought a declaratory judgment that he could compel a prison inmate to undergo medical treatment. The

24-year-old competent prisoner, housed in a medium security institution, developed a kidney condition that required hemodialysis, a procedure where blood is pumped out of the body, cleansed of its toxins by a mechanical filtering process, and then returned to the body. The treatments were administered three times a week in four-hour sessions. The Supreme Judicial Court of Massachusetts summarized the trial court's findings:

> [T]he defendant's refusal of treatment had "little to do with his disease, the nature or effects of the dialysis treatment, or the personal ramifications of continuing such treatment for the remainder of his life." His refusal was also unrelated to any religious objection to the treatments. Nor did the defendant wish to die. Rather, the court found that "Myers' refusal to take dialysis constitute[d] a form of protest against his placement in a medium, as opposed to a minimum, security prison." As found by the court, this protest stemmed from the defendant's belief that continued hemodialysis weakened him and reduced his ability to defend himself against other inmates.

*Myers*, 399 N.E.2d at 454. Believing the state's interest in the preservation of life and the prisoner's interest in avoiding significant, nonconsensual invasions of his bodily integrity yielded "a very close balance of interests," the *Myers* court nonetheless concluded:

> [T]he State's interest in upholding orderly prison administration tips the balance in favor of authorizing treatment without consent. Our evaluation of this interest takes account of the threat posed to prison order, security, and discipline by a failure to prevent the death of an inmate who attempts to manipulate his placement within the prison system by refusing lifesaving treatment. Consequently, on the facts of this case, it is clear that the Superior Court judge correctly concluded that State interests override the defendant's refusal of life-saving treatment.

1. In *Zant v. Prevatte*, 248 Ga. 832, 286 S.E.2d 715 (1982), the Supreme Court of Georgia held that a hunger-striking prisoner, who began fasting to obtain transfer out of the Georgia prison system for fear of his safety, had the right to die by refusing food and medical treatment. We, like every court that has considered *Zant*, refuse to follow it.

399 N.E.2d at 458. In this case, too, the state's interest in orderly prison administration overrides Vogel's refusal of treatment.

Vogel essentially argues, by inference, that the United States Supreme Court's decision in *Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178, makes the *Myers* analysis faulty. In *Harper*, the Court concluded that a judicial hearing was not required before the state could treat a mentally ill prisoner with antipsychotic drugs against his will. Vogel, we think, reads too much into the opinion by suggesting it means that a state may force medication on an inmate only if he is found to be incompetent and dangerous, or that it means penological concerns are irrelevant to a competent inmate's decision to refuse treatment. *Harper* doesn't stand for either proposition.

First, the Court limited its holding "to the category of antipsychotic drugs." *Harper*, 494 U.S. at 214 n. 1, 110 S.Ct. at 1032 n. 1. Second, the Court rejected the same type of contention Vogel makes here:

> [Prisoner] contends that the State, under the mandate of the Due Process Clause, may not override his choice to refuse antipsychotic drugs unless he has been found to be incompetent, and then only if the factfinder makes a substituted judgment that he, if competent, would consent to drug treatment. We disagree. The extent of a prisoner's right under the Clause to avoid the unwanted administration of antipsychotic drugs must be defined in the context of the inmate's confinement. The Policy under review requires the State to establish, by a medical finding, that a mental disorder exists which is likely to cause harm if not treated.

*Harper*, 494 U.S. at 222, 110 S.Ct. at 1037. Although the prison policy reviewed in *Harper*, 494 U.S. at 222–223 n. 8, 110 S.Ct. at 1037 n. 8, required as a necessary condition for forced medication that the inmate be "mentally ill and dangerous," the Court did not equate "mentally ill and dangerous" with "incompetence." One could conclude from *Harper*, 494 U.S. at 227–229, 110 S.Ct. at 1040, that a competent inmate has no more right than an incompetent inmate to reject forced medication "if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." We find nothing in *Harper* that gives a competent prisoner an absolute right to refuse necessary medical treatment regardless of a state's penological interests.[2]

In a decision after *Harper*, the Supreme Court of California in *Thor*, 21 Cal.Rptr.2d 357, 855 P.2d 375, demonstrated that balancing of interests remains the important inquiry. That court, upholding the right of a competent quadriplegic prisoner to refuse medical intervention, stated:

> We are not unmindful of the difficulties involved in maintaining an orderly and secure penal institution; and our holding does not imply any attenuation of the deference accorded the experience and expertise of administrative officials in such matters.... In another case, or in this case if a change of circumstances warrant, we do not preclude prison authorities from establishing the need to override an inmate's choice to decline medical intervention.... A custodial environment is uniquely susceptible to the catalytic effect of disruptive conduct; and courts will not interfere with reasonable measures required to forestall such untoward consequences....

*Thor*, 21 Cal.Rptr.2d at 370, 855 P.2d at 388 (citations omitted). In balancing Vogel's interests and the state's interests here, the trial court found that the prison authorities established the need to override Vogel's choice to refuse medical treatment.

Vogel argues the state must show, by clear and convincing evidence, that its rationale for forcing medication upon him serves a compel-

---

**2.** Nor do the federal and state statutes relied on by Vogel give him an absolute right to refuse medical treatment regardless of penological concerns. *See, e.g.,* Omnibus Budget Reconciliation Act of 1990, 42 U.S.C. § 1395cc(f)(1); NDCC Chapters 23–06.4 and 23–06.5; NDCC 25–01.2–15 and 25–03.1–02(11). None of these statutes specifically apply to Vogel in his current situa-tion. Moreover, to the extent these statutes demonstrate the general importance accorded by federal and state lawmakers to a person's interest in personal autonomy and self-determination, we have already recognized in this opinion that a person's interest in self-determination is a "fundamentally commanding one."

ling state interest that supersedes Vogel's interest in remaining free from physical intrusion. This argument, too, was rejected by the Supreme Court in *Harper.*

█ In *Harper,* the Court adhered to its ruling in *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), that the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is whether the regulation is "reasonably related to legitimate penological interests." The *Harper* Court made clear that the *Turner* standard of reasonableness "applies to all circumstances in which the needs of prison administration implicate constitutional rights," particularly fundamental ones. *Harper,* 494 U.S. at 224, 110 S.Ct. at 1038. *Compare Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418. The Court said the clear, cogent and convincing standard of proof "is neither required nor helpful when medical personnel are making the judgment required by the regulations here." *Harper,* 494 U.S. at 235, 110 S.Ct. at 1044. We conclude the reasonableness standard applies here.

█ The trial court found that Vogel's original September 1994 refusal to eat or take insulin was an attempt to manipulate the system and an act of blackmail against prison officials, that Vogel would have resumed eating and taking his insulin medication if his demands had been met, that his current refusal to take insulin is a result of anger and defiance for not being housed at the MRCC and allowed to work at the Radisson Inn, and that Vogel failed to show he was receiving too much insulin. Under NDRCivP 52(a), those findings are not clearly erroneous.[3]

Vogel made several documented demands to prison officials, including a request for "punitive" damages, as conditions to end his refusal to eat or to take medication. In keeping with penological considerations, Schuetzle made a placating counterproposal that Vogel rejected. According to his medical chart, on September 21, 1994, Vogel told his attending doctor he would continue on his hunger strike "unless the administration reverses itself." Schuetzle testified that he did not want the penitentiary to "be put in a position where the inmate believes they can blackmail the staff at the penitentiary with their health, and this is what I believe Mr. Vogel is doing. 'Send me back to the MRCC. Give me work release back or I will not eat'. I think that puts us at risk at the institution." The evidence of Vogel's blatant attempt to manipulate his placement within the prison system is overwhelming.

Although Vogel testified that he was being overmedicated, there was no expert testimony to support his private opinion. The prison doctor testified that Vogel's attempt to control his diabetes without medication would not work. The doctor also testified about the harm that Vogel could incur if he continued to refuse his treatment for diabetes. The doctor testified the effect of the disease on the vascular system can result in gangrene of the lower extremities, progressive heart failure, heart attack, double vision, renal failure, and a coma. According to the doctor, merely because Vogel thinks he is healthy now does not mean the physical changes leading to these problems "are not ongoing at this time."

Vogel argues that his treatment refusal cannot viably blackmail prison officials if it does not effectively gain an advantage. However, the trial court found Vogel contin-

---

3. Vogel complains about the trial court allowing counsel for the state to draft the findings of fact, conclusions of law, and order in this case. Apparently, the trial court issued no memorandum opinion and telephoned both counsel that he would be ruling for the state, and directing the state to prepare an order. We prefer that the court state in its own words the rationale and basis for its decision because merely informing the parties who wins and directing the prevailing party to prepare the necessary findings and conclusions may fail to foster the appearance of

fairness and impartiality in our courts. *See Schmidkunz v. Schmidkunz,* 529 N.W.2d 857, 859 (N.D.1995). Here, the trial court modified some findings, indicating the court was doing its own thinking, and signed the modified findings and conclusions, thus making them the findings and conclusions of the court. *See Schmidkunz,* 529 N.W.2d at 858–859. The trial court adequately complied with NDRCivP 52(a) and did not commit reversible error in the decision-making process.

ues to refuse insulin in anger and defiance for failing in his attempt to control his prison environment. The state has an interest in halting a prisoner's attempted blackmail, whether it will be effective or not.

This might be a closely balanced case if it was only a contest of wills between Vogel and Schuetzle. But there is more here. Aside from Vogel's attempt to manipulate the system, Vogel asserted that, if he would change his mind in the future, when damage caused by his refusal to take diabetes medication had become substantial, the state would have an Eighth Amendment obligation to provide him with the then required medical care. *See generally Ennis v. Dasovick,* 506 N.W.2d 386 (N.D.1993) (discussing Eighth Amendment proscription against deliberate indifference to a prisoner's serious medical needs). According to the prison medical director, renal dialysis and cardiac bypass surgery, "two real things that could happen to an untreated diabetic," would be "extremely costly." The state's interest in averting potentially devastating healthcare costs is also substantial in this case.

We conclude the requirement that Vogel take diabetes medication against his will is reasonably related to legitimate penological interests. The trial court correctly ruled that prison officials could require Vogel to submit to diabetes monitoring and, if ordered by a physician, forcibly administer to Vogel food, insulin and other medications. The other arguments made by the parties do not affect our decision. The declaratory judgment is affirmed.

VANDE WALLE, C.J., and LEVINE, NEUMANN and SANDSTROM, JJ., concur.