MacLeod-Mancuso, Bonnie H., J.
This case arises from the sale of a home by defendants, Robert E. Corvi (“Corvi, Sr.”), individually and as administrator of the estate of Ann Corvi, Robert E. Corvi, II (“Corvi, II”), Sarah Spinale, and Mary Ann Manzoli (“Manzoli”) (collectively the “moving party defendants”), to the plaintiffs, John Sweeney and Helen Sweeney (“the Sweeneys”). The remaining defendants, Joyce E. Henson (“Henson”) and Richard Deluca d/b/a Deluca Real Estate (“Deluca”) (collectively the “non-moving party defendants”), assisted in the sale of the home to the Sweeneys. The Sweeneys have brought eight claims against the moving party defendants: (Count I) - Breach of Contract; (Count II) - Fraud, Deceit, and Misrepresentation; (Count III) -Negligent Misrepresentation; (Count IV) - Negligence; (Count V) - Breach of the Implied Warranty of Habitability; (Count VI) - Conversion; (Count VII) - Unjust Enrichment; and (Count VIII) - Breach of the Covenant of Good Faith and Fair Dealing.[5] For the reasons stated herein, the Defendants Robert E. Corvi, Individually and as Administrator of the estate of Ann Corvi, Robert E. Corvi, II, Sarah Spinal, and Maiy Ann Manzoli’s Motion for Summary Judgment is ALLOWED, in part, as follows: as to Count I, for Manzoli and Corvi, Sr., individually; as to Counts II and III, for Corvi, Sr., individually only; as to Counts IV, V, VI, and VIII, for all moving parly defendants; and as to Count VII, for Corvi, Sr., individually and as administrator of the estate of Ann Corvi, Corvi, II, and Sarah Spinale. The moving party defendants’ motion is DENIED, in part, as follows: as to Count I, for Corvi, Sr., as administrator of the estate of Ann Corvi, Corvi, II, and Sarah Spinale; as to Counts II and III, for Corvi, Sr., as administrator of the estate of Ann Corvi, Corvi, II, Sarah Spinale and Manzoli; and as to Count VII, for Manzoli only.

BACKGROUND

At this point in the litigation, the facts are presented in the light most favorable to the Sweeneys. The facts in this case are lengthy. Accordingly, the court limits its discussion to those facts which are dispositive of the pending motion.
In 2002, the Sweeneys sought to purchase a retirement home. Their search led them to a home located at 62 Woods Road in Medford, Massachusetts (the “Woods Road Home”). The Woods Road Home had been built by James Spinale in 1960. James Spinale was the husband of Sarah Spinale, the father of Manzoli, the grandfather of Corvi, II, and the father-in-law of Corvi, Sr. James Spinale died prior to the Sweeneys’ introduction to the Woods Road Home. At all material times, Corvi, II and Ann Corvi’s estate each owned a one-half interest in the Woods Road Home. Corvi, Sr. acted as the administrator of his late wife’s, that is Ann Corvi’s, estate during these events. Additionally, Sarah Spinale, now-deceased, owned a life estate in the Woods Road Home at the time.
On June 3, 2002, the Sweeneys offered $360,000 for the Woods Road Home, contingent on a home inspection. On June 10, 2002, inspector Mike McLean inspected the property and suspected termite damage. Based upon this discovery of termite damage, the Sweeneys withdrew their offer. At that time, Alfred DiMambro (“DiMambro”) inspected the Woods Road Home to furnish an estimate as to the cost of repairing the termite damage. Manzoli hired a contractor to open up the damaged area for DiMambro’s viewing. Thereafter, the parties agreed to a $20,000 reduction in the price in order to address the termite damage.
On June 17, 2002, the Sweeneys, Corvi, II, and Corvi, Sr., on behalf of Ann Corvi’s estate, signed a Purchase and Sale Agreement. Section 4 of the Purchase and Sale Agreement conveys the criteria for conveyance of the title. Section 9(b) of the Purchase and Sale Agreement states that at the time of the deed’s deliveiy, the properly was “to be then . . . not in violation of building and zoning laws.” On September 13, 2002, the Sweeneys purchased the home and began performing repairs. Subsequently, the Sweeneys discovered that a basement partition wall had been built, which concealed cracks and a sinking foundation. The partition had been built over live *630 electrical conduits. Further investigation by the Sweeneys uncovered the fact that the house sat on live gas pipes as a result of its sinking foundation. The Sweeneys have since discovered that the property had been built upon approximately twelve to forty-two feet of peat and other forms of unstable subsoil. The Sweeneys now claim that the Woods Road Home must be tom down and rebuilt with pilings re-driven due to structural and water problems.

Manzoli's Alleged Ownership of the Woods Road Home

The Sweeneys primarily negotiated the purchase of the Woods Road Home with Manzoli. The Sweeneys contend Manzoli is an owner of the Woods Road Home even though her name does not appear on the deed or the Purchase and Sale Agreement. Manzoli presented herself as the owner of the property to the Sweeneys and to the sales sub-agent for the sellers, Diane Brandano (“Brandano”). Brandano believed that Manzoli was the owner of the property during their meetings. Manzoli also managed the property since 1990.
Corvi, Sr. has stated that Manzoli acted on his behalf in the sale of the Woods Road Home and that Manzoli received part of the sales proceeds. According to Corvi, Sr., James Spinale had excluded Manzoli’s name from the Woods Road Home deed in order to prevent Leo Manzoli, Manzoli’s husband, from receiving any proceeds in the event of a sale. Corvi, Sr. had agreed to give Manzoli a portion of the proceeds from the sale of the Woods Road Home despite her exclusion from the deed.

Manzoli’s and Henson’s Alleged Knowledge of the Structural and Water Problems

Manzoli was present during the construction of the Woods Road Home in 1960. Manzoli lived at the Woods Road Home from the time of its construction until approximately 1967, when she married at the age of twenty-six. Since that time, Manzoli periodically visited her parents at the Woods Road Home. She visited the property weekly after her mother, Sarah Spinale, moved out in August 2001.
The Sweeneys have directed the court’s attention to specific occurrences related to the alleged structural problems, which they claim indicate Manzoli’s knowledge. In 1983, James Spinale obtained a resolution from the Medford Ci1y Council requesting that “the School Department re-route the school buses traveling through Woods Road due to the heavy vibration from the buses causing damages to the foundation of the home of Mr. James Spinale, 62 Woods Road.” Manzoli denies having any knowledge of this resolution’s passage or the events which precipitated its need. Manzoli knew about a crack in the Woods Road Home’s exterior by its entrance. Manzoli’s father had advised her that the crack “was due to settlement.” Manzoli hired a contractor to paint the interior and exterior of the Woods Road Home prior to its sale. The painter filled cracks on the exterior of the home. Additionally, during her deposition, Manzoli recognized items which the Sweeneys had discovered behind the false wall in the basement.
Manzoli stated that she had previously witnessed flooding problems on Woods Road, which likely occurred during the 1970s. Manzoli recalled discussing the flooding problems on Woods Road with her parents following a heavy rain storm. Moreover, Manzoli was aware that a home at 69 Woods Road had experienced flooding problems following the heavy rains. Flooding problems also occurred on Woods Road in 1998, requiring at least one resident, living across the street from the Woods Road Home, to be evacuated by canoe. Approximately one month before the Sweeneys expressed interest in the Woods Road Home, Manzoli observed a “layer of water” on the basement floor running from “side to side.” Manzoli informed the City of Medford of the problem and stated that “there was something wrong outside coming into the house.”
Manzoli hired Henson as a listing broker to assist in the sale of the Woods Road Home. Henson also owns a home on Woods Road. Henson has testified that her own home, located diagonally across the street from the Woods Road Home, had become unleveled due to settlement problems. Henson informed Manzoli of this problem prior to the sale of the Woods Road Home. Henson had heard that houses on Woods Road were sinking and had water problems. Originally, Henson testified that Manzoli had denied the existence of any settlement problems at the Woods Road Home when Henson had asked. A handwritten note by Henson, however, states that a recommended price she provided for the Woods Road Home, prior to its sale to the Sweeneys, was “based somewhat upon some settlement in the house and area.” Henson stated that she obtained some of the information present in that note from Manzoli, but could not recollect whether the specific reference to settlement reflected information provided by Manzoli. Notably, three residents of Woods Road have each individually affirmed that “local residents are commonly aware that the houses on Woods Road were built upon peat and have ground settling” problems or sinking issues.

The Alleged Misrepresentations

During the Sweeneys’ viewings and inspections of the Woods Road Home, the Sweeneys asked Manzoli and Henson several times whether any water, flooding, or structural issues existed regarding the property and neighborhood. Manzoli and Henson each denied the existence of any problems except for a “one-time termite problem.” Helen Sweeney specifically asked whether the basement had ever had any structural or water problems. In response, Manzoli denied the existence of any problems. Helen Sweeney also asked both Manzoli and Henson whether they knew of any water problems with the house or the area. Both Manzoli and Henson denied the existence of any such problems.
*631 The Sweeneys had previously rejected several properties because the properties had water or structural problems, or because the owner or broker could not confirm whether or not such problems existed. Brandano corroborates that Helen Sweeney asked Manzoli and Henson questions regarding water and structural problems and that each denied the existence of such problems. DiMambro, the contractor engaged by the Sweeneys to give an estimate for the termite damage, also asked Manzoli and Henson if the house had any water or structural damage. Again, both denied any such trouble. Manzoli denies the allegations and further denies that the Sweeneys or DiMambro asked any questions regarding water or structural problems.

SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing parly’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The mere assertion of a genuine factual dispute by the nonmoving party, “absent factual material upon which the assertion might be proved, is not sufficient to defeat summary judgment.” Massachusetts Mun. Wholesale Elec. Co. v. City of Springfield, 49 Mass.App.Ct. 108, 113 (2000) (additional citations omitted).

DISCUSSION

I. Count I; Breach of Contract
The Sweeneys maintain that the moving party defendants have breached the Purchase and Sale Agreement by making false representations regarding the property. The moving party defendants counter that the Purchase and Sale Agreement was merged with the deed when the deed was transferred to the Sweeneys, thereby prohibiting a claim for breach of contract. Generally, once a buyer of real property accepts a deed of conveyance of land, the contractual rights embodied in a purchase and sale agreement are discharged “except such as are embodied in the deed.” McMahon v. M&D Builders, Inc., 360 Mass. 54, 59 (1971). An exception to this rule exists, however, for additional or collateral promises to the main promise to convey contained in a purchase and sale agreement, so long as those promises are not inconsistent with the deed. Id.
Here, the Sweeneys have alleged and provided evidentiary support for the proposition that the moving party defendants made oral promises related to the integrity of the foundation of the home and the absence of water problems.[6] These oral promises, assuming they were made, were “additional or collateral” to the main promise to convey contained in the Purchase and Sale Agreement. Id. Further, these promises were not inconsistent with the deed itself. Id. Accordingly, the Sweeneys’ claims for breach of contract are not barred by the Sweeneys’ acceptance of the deed.
The Sweeneys’ claims against Manzoli and Corvi, Sr., individually, for breach of contract, however, must fail. No evidence has been submitted from which a jury could infer that Corvi, Sr., individually, is liable under the Purchase and Sale Agreement.[7] Manzoli was not an owner of the Woods Road Home and she did not sign the Purchase and Sale Agreement. The Sweeneys have presented evidence, which demonstrates that Manzoli held herself out as the owner of the Woods Road Home and received a portion of the proceeds from its sale. Any proceeds derived from the sale of the Woods Road Home, which Manzoli received, were the product of a separate agreement between herself and the owners of the Woods Road Home. Further, the Sweeneys were on notice that Manzoli was not an owner of the Woods Road Home when she did not sign the Purchase and Sale Agreement. Accordingly, the Sweeneys’ claims against Manzoli and Corvi, Sr., individually, for breach of contract must fail as a matter of law because they were neither owners of the Woods Road Home or parties to the Purchase and Sale Agreement with the Sweeneys.[8]'

II. Count II: Fraud, Deceit, and Misrepresentation

The Sweeneys maintain that the moving party defendants intentionally misrepresented the condition of the home, thereby inducing the Sweeneys to purchase the Woods Road Home to their detriment. The moving party defendants counter that the Sweeneys do not have evidence of an intentional misrepresentation. The moving party defendants further contend that even if such evidence has been submitted, the exculpatory clauses in the Purchase and Sale Agreement prohibit a claim for intentional misrepresentation.[9] In order to recover under a claim of fraudulent misrepresentation, the Sweeneys must demonstrate that: (1) the moving party defendants made a false representation of a material fact; (2) with knowledge of its falsify; (3) for the purpose of inducing the plaintiffs to act thereon; (4) that the plaintiffs relied upon the representation as true; and (5) acted upon it to their damage. Barrett Assocs. Inc. v. Aronson, 346 Mass. 150, 152 (1963), quoting Kilroy v. Barron, 326 Mass. 464, 465 (1950), Alpine v. Friend Bros. Inc., 244 Mass. 164, 167 (1923).
*632 As an initial matter, the Sweeneys have submitted direct evidence of fraud. This evidence includes, though is not limited to: (1) the alleged denials made by Manzoli and Henson of the existence of structural or water problems; (2) the Medford City Counsel Resolution to stop buses from passing through Woods Road; (3) Manzoli’s discussions with her father regarding settlement; (4) the moving party defendants’ apparent knowledge of similar problems confronting other homes in the neighborhood; (5) the existence of a false wall in the basement, which concealed alleged structural problems; and (6) Henson’s handwritten note. Based upon this evidence, a juiy could reasonably find that Manzoli or Henson had knowledge of structural or water problems when they denied their existence.[10] Further, the Sweeneys have stated under oath that they relied on Manzoli’s and Henson’s representations. The Sweeneys have also stated that their practice was to immediately stop pursuing a home if a seller could not or would not give them assurances regarding the structural integrity of a home and the absence of water problems. In short, the Sweeneys have met their initial burden of producing admissible evidence from which a jury could reasonably find the moving party defendants liable for fraud, deceit or intentional misrepresentation.[11]
As a general rule, a party may not contract away fraud. Bates v. Southgate, 308 Mass. 170, 182 (1940). The moving party defendants rely on Cone u. Ellis as support for the proposition that the Sweeneys’ claims are barred by the exculpatory clause in the Purchase and Sale Agreement. 59 Mass.App.Ct. 748, 751-52 (2003). The moving party defendants’ reliance on Cone is misplaced. In Cone, the buyers were partially advised of a termite problem, which was more pervasive than represented by the sellers. Id. Also, the parties in Cone customized the boiler plate exculpatory language to match the parties’ particular needs. Id. In contrast, the moving party defendants advised the Sweeneys of “one-time termite damage,” an entirely separate problem from the structural and water problems upon which the Sweeneys base their claims. Further, the boiler plate exculpatory clause was not altered in this case. Accordingly, the general rule that a party may not contract away fraud is applicable and, therefore, the exculpatory clause does not bar the Sweeneys’ claims for fraud, deceit or intentional misrepresentation. Bates, 308 Mass. at 182.

III. Count III: Negligent Misrepresentation

The Sweeneys also maintain that the moving party defendants made negligent misrepresentations. The Supreme Judicial Court has stated that:
In order to recover for negligent misrepresentation . . . plaintiffls] must prove that the defendant (1) in the course of his business, (2) supplie(d) false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and [that the defendant] (6) . . . faified] to exercise reasonable care or competence in obtaining or communicating the information. Fox v. F&J Gattozzi Corp., 41 Mass.App.Ct. 581, 587-88 (1996). See Restatement (Second) of Torts §552 (1977). A claim for negligent misrepresentation is ordinarily one for a jury, unless the undisputed facts are so clear as to permit only one conclusion. Fox v. F&J Gattozzi Corp., 41 Mass.App.Ct. at 588.
Golber v. Bay Bank Valley Trust Co., 46 Mass.App.Ct. 256, 257 (1999), quoting Nota Constr. Corp. v. Keyes Assocs., Inc., 45 Mass.App.Ct. 15, 19-20 (1998). The moving party defendants contend that no evidence of negligent misrepresentation has been submitted, and even if such evidence has been submitted the exculpatory clauses bar these claims for negligent misrepresentation.
The aforementioned evidence of fraud is similarly applicable to these claims. Additional evidence of negligent misrepresentation includes: Manzoli’s statement that the flooding on Woods Road “didn’t cross my mind”; and Manzoli’s statement that the fact that nearby homes had sunk “never entered my mind.” The Sweeneys have submitted admissible evidence upon which a jury could reasonably find the moving party defendants liable for negligent misrepresentation.[12]
The moving party defendants rely on Sound Techniques v. Hoffman as support for the proposition that the exculpatory clauses bar the Sweeneys’ claims for negligent misrepresentation. 50 Mass.App.Ct. 425, 432-33 (2000) (barring claims for negligent misrepresentation in commercial transaction due to presence of exculpatory clause). The defendant’s reliance on SoundTechniquesis also misplaced. Notably, the holding in Sound Techniques was expressly limited “to the circumstances of [the] case.” Id. at 434 n. 11. In Sound Techniques, the lease at issue was commercial and, more significantly, the court noted an absence of any evidence of fraud in the procurement of the lease. Id. Here, in contrast, the Sweeneys have submitted sufficient evidence to warrant a finding of fraud against the moving party defendants. Additionally, this transaction was not between commercial parties. The moving party defendants may not now rely on a non-commercial contract which was possibly procured by fraud to bar the Sweeneys’ claims of negligent misrepresentation.[13] Accordingly, the Sweeneys’ claims of negligent misrepresentation survive the moving party defendants’ motion for summary judgment.

IV. Count IV: Negligence

The Sweeneys allege that the moving party defendants owed the Sweeneys a “duty of care to transfer full possession of the subject premises in compliance with all building codes and/or other applicable laws . . ,”[14] The moving party defendants maintain that they did not owe a duty of care to the Sweeneys. Typically, home sellers do not owe a fiduciary duty to *633 home buyers. Urman v. South Boston Sav. Bank, 424 Mass. 165, 168 (1997); See Friedman v. Jablonski, 371 Mass. 482, 485 (1976) (stating that no fiduciary relationship exists between buyers and sellers in arms-length transaction). The Sweeneys have not pointed to any evidence that the moving party defendants affirmatively assumed a duty of care that would obligate them to provide a home “in compliance with all building codes and or other applicable laws.”
Section 9(b) of the Purchase and Sale Agreement does not create such a duty. See Solomon v. Birger, 19 Mass.App.Ct. 634, 640-42 (1985) (stating that language identical to Section 9(b) only applied to the “conditions upon which the buyer may accept or refuse conveyance”). The court in Solomon interpreted a purchase and sale agreement, which included identical provisions to Sections 4 and 9(b) of the Purchase and Sale Agreement signed by the parties. Id. Sections 4 and 9(b) of the Purchase and Sale Agreement worked interdependently. Id. at 641. Section 4 provided for a period of time between the signing of the Purchase and Sale Agreement and conveyance of the deed, in which the Sweeneys could have investigated the Woods Road Home. Id. After signing the Purchase and Sale Agreement and before the conveyance of the deed, the Sweeneys could have, under Section 9(b), opted “out of the agreement” if they had discovered a building code violation. Id. Once the Woods Road Home was conveyed, Section 9(b) ceased to apply. Id. Section 9(b) did not create a duty obligating the moving party defendants to deliver the Woods Road Home free of building code violations to the Sweeneys, but rather constituted criteria under which the Sweeneys could have opted out of the Purchase and Sale Agreement prior to conveyance. Accordingly, the Sweeneys’ claims for negligence must fail as a matter of law.

V.Count V: Breach of the Implied Warranty of Habitability

The Sweeneys claim that the moving party defendants breached an implied warranty of habitability. Generally, a warranty of habitability is not implied in the sale “of a home from one purchaser to another.” Id. at 638 n.7 (distinguishing sales by builder-seller to buyer, which may have an implied warranty of habitability). This general rule is applicable to the moving party defendants. Although the moving party defendants do not appear to have purchased the Woods Road Home, they stand in an equivalent position, having inherited the property. No evidence of an express warranty has been submitted by the Sweeneys. In Solomon, identical language to that used in Section 9(b) of the Purchase and Sale Agreement was deemed not to create an implied warranty of habitability. Id. Accordingly, the Sweeneys’ claims that the moving party defendants breached an implied warranty of habitability must fail as a matter of law.

VI.Count VI: Conversion

The Sweeneys claim that the moving party defendants converted their payment for the Woods Road Home. An action for conversion consists of the followingelements: (1) that a party had possession, oraright to immediate possession of the personal property; (2) that the defendant converted the personal property to her own use, without right, either by appropriating the property, by depriving the rightful owner of it, or by destroying it; and (3) that the plaintiff sustained damages. Row v. Homes Sav. Bank, 306 Mass. 522, 525 (1940). Money can be the subject of a claim for conversion if the money is a specifically identifiable lot of money, which the defendant was obligated to keep intact or deliver. See 53A Am.Jur. 2D Money §21 (2005), citing Garras v. Bekiares, 23 N.W.2d 239, 241 (Mich. 1946) (allowing claim for conversion where money is identifiable and defendant had obligation to return the specific money with which he was entrusted), U.S. Fid. & Guar. v. Bass, 619 F.2d 1057, 1060 (5th Cir. 1980) (stating that “a cause of action may arise from conversion of specific money capable of identification”), and Teledyne Indus. Inc. v. Eon Corp., 373 F.Sup. 191, 202 (S.D.N.Y. 1974) (applying conversion claim to a “special account”). Here, the Sweeneys’ claim is for a particular sum, but not for an identifiable lot of money that the moving party defendants were obligated to keep intact or deliver. Accordingly, the Sweeneys’ claims for conversion against the moving party defendants must fail as a matter of law as they do not concern personal property.

VII.Count VII: Unjust Enrichment

The Sweeneys must demonstrate the following elements to succeed on their claims of unjust enrichment; (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention inequitable. See 12 Williston on Contracts §1479 (3d ed. 1957). A claim of unjust enrichment provides for an equitable remedy, which is meant to fill in remedial gaps when no adequate remedy at law is present. Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 (1992). Here, the Sweeneys have claims of breach of contract and claims sounding in tort, which, if the moving party defendants are held liable, will adequately compensate the Sweeneys for their losses. As stated in Section I, the Sweeneys’ claims for breach of contract have survived against all moving party defendants except Manzoli and Corvi, Sr., individually. Therefore, Manzoli and Corvi, Sr., individually, stand on a separate footing.
The Sweeneys have not submitted any evidence indicating that Corvi, Sr. stood to benefit individually from the sale of the Woods Road Home. Accordingly, the Sweeneys’ claim against Corvi, Sr., individually, alleging unjust enrichment must fail as a matter of *634 law. On the other hand, evidence has been put forth that Manzoli stood to benefit from the sale of the Woods Road Home. Manzoli was not a party to the Purchase and Sale Agreement and, therefore, no contractual remedy is in place to disgorge her alleged windfall from the sale of the Woods Road Home. Accordingly, the Sweeneys’ claim of unjust enrichment against Manzoli survives the motion for summary judgment. The Sweeneys’ claims of unjust enrichment against all other moving party defendants must fail as a matter of law as an adequate remedy already exists. See Fox v. F&J Gattozi Corp., 41 Mass.App.Ct 581, 589 (1996).

VIII. Count VIII: Breach of the Implied Covenant of Good Faith and Fair Dealing

The Sweeneys maintain that the moving party defendants breached the implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is present in every contract. Fortune v. National Cash Register Co., 373 Mass. 96, 104 (1977). The implied covenant of good faith and fair dealing applies to the performance of a contract, however, not its execution. Sheehy v. Upton Indus. Inc., 24 Mass.App.Ct. 188, 194 n.6 (1987). All of the Sweeneys’ claims are based upon actions which occurred prior to and/or during the execution of the contract. Accordingly, the Sweeneys’ claims of breach of the implied covenant of good faith and fair dealing must fail as a matter of law, as they concern the execution of the parties’ agreement rather than the moving party-defendants’ performance of the contract following execution. Id.

ORDER

For the foregoing reasons, after careful consideration of the parties’ written submissions and oral arguments, the Defendants Robert E. Corvi, Individually and as Administrator of the estate of Ann Corvi, Robert E. Corvi, II, Sarah Spinale, and Mary Ann Manzoli’s Motion for Summary Judgment is ALLOWED, in part, as follows: as to Count I, for Manzoli and Corvi, Sr., individually; as to Counts II and III, for Corvi, Sr., individually only’; as to Counts IV, V, VI, and VIII, for all moving party defendants; and as to Count VII, for Corvi, Sr., individually and as administrator of the estate of Ann Corvi, Corvi, II, and Sarah Spinale. The moving party defendants’ motion is DENIED, in part, as follows: as to Count I, for Corvi, Sr., as administrator of the estate of Ann Corvi, Corvi, II, and Sarah Spinale; as to Counts II and III, for Corvi, Sr., as administrator of the estate of Ann Corvi, Corvi, II, Sarah Spinale and Manzoli; and as to Count VII, for Manzoli only.

 The Sweeneys’ original Complaint included counts against the moving party defendants for vicarious liability and violation of G.L.c. 93A. The Sweeneys have since submitted a Second Amended Complaint that excludes the moving party defendants from these counts.

 Sufficient evidence has been submitted upon which a jury could reasonably find that Manzoli and/or Henson were acting as agents for Corvi, II, Corvi, Sr., as administrator of Ann Corvi’s estate, and Sarah Spinale. See Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 742-43 (2000) (discussing agency relationship and principal’s liability for agent’s actions).

 Section 1 of the Purchase and Sale Agreement lists Corvi, Sr. as a party to the agreement as “surviving spouse of Ann C. Corvi, on behalf of Ann C. Corvi Estate.” Further, Section 24 of the Purchase and Sale Agreement limits liability of the parties to the representative capacity by which they executed the agreement and bars the imposition of liability on beneficiaries of a trust. Accordingly, although the signature line describes Corvi, Sr. as an heir to Ann Corvi’s estate, by the terms of the agreement he may not individually be held liable under the agreement.

 As an additional matter, the facts are not clear as to what extent, if at all, Sarah Spinale was represented in the dealings related to the Woods-Road Home. Although an owner of interest in the property, her signature does not appear on the Purchase and Sale Agreement. Her interest in the property, a life estate, could not be sold by the other parties holding an ownership interest. Notably, the moving party defendants have not pressed this argument in their motion. At this time, the Court allows the claims against Sarah Spinale to move forward, however, the parties are encouraged to provide further information as to the representation of Sarah Spinale in these matters.

 The moving party defendants refer to §§32 and 35 of the Addendum to Purchase and Sale Agreement.
Section 32 states: BUYER(S) acknowledge that they have been given the option to have a home and pest inspection and in so doing, release the BROKER and SELLER from liability relating to defects in the premises which the BROKER and SELLER disclosed, or about which the BROKER and SELLER had no actual knowledge prior to the execution of this Agreement.
Section 35 states: The BUYER(S) acknowledge(s) that the BUYER(S) have (has) made a total examination of the property herein and is purchasing it in its as is condition, and further acknowledges that the SELLER(S) and the BROKER herein have made no agreement or representation, expressed or implied, other than those contained herein.

 See supra note 6.

 Claims against Corvi, Sr., individually, are dismissed as he was not a party to the alleged actions.

 Claims against Corvi, Sr., individually, are dismissed as he was not a party to the alleged actions.

 In the event that a jury finds the moving party defendants not liable for fraud or intentional misrepresentations, the Sweeneys’ claims for negligent misrepresentation may possibly also fail as a matter of law. See Sound Techniques, 50 Mass.App.Ct. at 434 (noting the general policy upholding freedom to contract absent egregious conduct or fraud). This Court chooses not to prematurely express an opinion upon the viability of the Sweeneys’ claims for negligent misrepresentation before findings of fact have been made by a jury. See Id. at 434 n.ll.

 The remaining claims under Count IV are duplicative of claims stated in Count III.